**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 15-100 |
| WALTER REED AND STEVEN REED | SECTION "L" |

## ORDER & REASONS

Pending before the Court are Motions for Judgment of Acquittal and Arrest of Judgment (R. Doc. 261) and for New Trial (R. Doc. 263) filed by Defendant Walter Reed (W. Reed), and a Motion for Acquittal, New Trial, and Arrest of Judgment (R. Doc. 329) filed by Defendant Steven Reed (S. Reed). The Government opposes all of the motions in an Omnibus Response. (R. Doc. 337). Having read the parties' briefs, reviewed the applicable law, and heard the parties on oral argument, the Court now issues this Order & Reasons.

## CONTENTS

I.   BACKGROUND .................................................................................................... 4

II.  PRESENT MOTIONS .......................................................................................... 6

   A.   Legal Standards ........................................................................................... 6

      1.   Standard for Judgment of Acquittal ..................................................... 6

      2.   Standard for Arrest of Judgment ........................................................... 7

      3.   Standard for a New Trial ........................................................................ 7

   B.   W. Reed's Motions for Judgment of Acquittal and Arrest of Judgment and for a New Trial ................................................................................................... 8

      1.   Federalism (Counts 1-8 and 10) ............................................................. 9

         (a)   W. Reed's Arguments ................................................................. 10

         (b)   The Government's Response ...................................................... 13

         (c)   Analysis ........................................................................................ 14

      2.   Sufficiency of the Evidence – the Open House (Count 1), Thanksgiving Dinners (Count 4), church donations (Counts 2, 6, 8), Gift cards (Count 1, 11-14), St. Paul's High School (Counts 11-14), and Flowers to Christine Curtis (Count 5). ...... 26

         (a)   W. Reed's Arguments ................................................................. 26

         (b)   The Government's Arguments ................................................... 29

         (c)   Analysis ........................................................................................ 31

      3.   The Tax Returns ...................................................................................... 35

         (a)   W. Reed's Arguments ................................................................. 35

         (b)   The Government's Arguments ................................................... 36

         (c)   Analysis ........................................................................................ 38

      4.   The Hospital ............................................................................................ 40

         (a)   W. Reed's Arguments ................................................................. 40

         (b)   The Government's Arguments ................................................... 40

         (c)   Analysis ........................................................................................ 41

      5.   Inappropriate merger of money laundering and wire fraud ............................ 42

         (a)   W. Reed's Arguments ................................................................. 42

         (b)   The Government's Arguments ................................................... 43

         (c)   Analysis ........................................................................................ 43

      6.   Motion for Arrest of Judgment is Untimely and Unwarranted ...................... 45

         (a)   Government's Arguments .......................................................... 45

         (b)   Analysis ........................................................................................ 45

      7.   Exclusion of Critical Evidence ............................................................. 45

|  |  | (a) | W. Reed's Arguments | 45 |
|  |  | (b) | The Government's Arguments | 47 |
|  |  | (c) | Analysis | 49 |
|  | 8. | Introduction of Improper Evidence | | 54 |
|  |  | (a) | W. Reed's Arguments | 54 |
|  |  | (b) | The Government's Arguments | 56 |
|  |  | (c) | Analysis | 56 |
|  | 9. | Severance | | 66 |
|  |  | (a) | W. Reed's Arguments | 66 |
|  |  | (b) | The Government's Arguments | 66 |
|  |  | (c) | Analysis | 67 |
|  | 10. | Prosecutorial Misconduct | | 73 |
|  |  | (a) | W. Reed's Arguments | 73 |
|  |  | (b) | The Government's Arguments | 74 |
|  |  | (c) | Analysis | 76 |
| C. | S. Reed's Motion for Judgment of Acquittal, Arrest of Judgment, or New Trial | | | 78 |
|  | 1. | Ineffective Assistance of Counsel | | 78 |
|  |  | (a) | S. Reed's Arguments | 78 |
|  |  | (b) | Government's Arguments | 80 |
|  |  | (c) | Analysis | 81 |
|  | 2. | Pinkerton | | 82 |
|  |  | (a) | S. Reed's Arguments | 82 |
|  |  | (b) | Government's Arguments | 83 |
|  |  | (c) | Analysis | 83 |
|  | 3. | Sufficiency of the Evidence | | 85 |
|  |  | (a) | S. Reed's Arguments | 85 |
|  |  | (b) | Government's Arguments | 86 |
|  |  | (c) | Analysis | 88 |
|  | 4. | Paternity | | 91 |
|  |  | (a) | S. Reed's Arguments | 91 |
|  |  | (b) | Government's Arguments | 91 |
|  |  | (c) | Analysis | 92 |
| III. CONCLUSION | | | | 92 |

## I.   BACKGROUND

From 1985 to January 12, 2015, W. Reed served as the District Attorney for Louisiana's 22nd Judicial District. S. Reed is his son. On April 23, 2015, the United States Government filed an eighteen-count indictment charging Defendants W. Reed and S. Reed with conspiracy to commit wire fraud and money laundering, as well as substantive counts of wire fraud, money laundering, false statements on income tax returns, and mail fraud. On October 22, 2015, the Government filed a superseding indictment (the "Indictment"), adding an additional wire fraud count (Count 8) against W. Reed.

The gravamen of the conspiracy and wire fraud counts (Counts 1-8) is Defendants' alleged improper personal use of campaign funds. The jury found that W. Reed solicited campaign funds from donors on the premise that the funds would be used to facilitate his reelection, and then used those funds for personal expenses unrelated to his campaign or the holding of public office. Specifically, the wire fraud counts alleged that, inter alia, W. Reed used campaign donations to (i) recruit potential clients for his private legal practice, (ii) pay off various expenses incurred by S. Reed, (iii) pay for private and personal dinners, (iv) purchase flowers for personal reasons, (v) overpay his son for work allegedly performed on behalf of the Campaign, and (vi) host a housewarming party for friends and family unrelated to the Campaign or the holding of public office. Further, W. Reed and S. Reed were charged with engaging in money laundering (Counts 9 and 10)[1] when they caused two service providers for a campaign-related event to make payments to entities controlled by S. Reed in a manner that would disguise the payments as legitimate expenses when, in fact, the payments were for the Defendants'

---

[1] The jury convicted both Defendants as to Count 9 but found them not guilty as to Count 10.

4

personal benefit. S. Reed was only charged with conspiracy to commit wire fraud, one count of wire fraud (Count 7) and money laundering.

In addition to the wire fraud and money laundering counts, the Indictment also alleged that W. Reed engaged in mail fraud when, in exchange for legal representation by the District Attorney's office, he deposited payments made by the St. Tammany Parish Hospital (the "Hospital") into his own personal bank accounts for private use. According to the Indictment, he arranged for checks to be sent to the District Attorney's office and then deposited them into his personal bank account when he knew these funds were actually intended for the Office of District Attorney. Finally, the Indictment alleges that W. Reed underreported his income on his tax returns for four years (Counts 11-14).

An eleven-day jury trial took place from April 19-May 2, 2016. After trial, the Jury found W. Reed guilty as to counts one-nine and eleven-nineteen, and S. Reed guilty as to counts one, seven, and nine. (R. Doc. 247). Both W. Reed and S. Reed were found not guilty as to count ten. *Id*. Upon leave of the Court for additional time to file, W. Reed filed Motions for Acquittal and Arrest of Judgment and for New Trial. (R. Docs. 261, 263). S. Reed obtained a new attorney post-trial. Accordingly he requested, and the Court granted, additional time to file his post-judgment motions. S. Reed timely filed a Motion for Acquittal, New Trial, and Arrest of Judgment. (R. Doc. 329). Because of the Supreme Court's recent decision in *United States v. McDonnell* 136 S. Ct. 2355 (2016), which may be relevant to the instant case, the Court granted W. Reed leave to file a supplemental memorandum to address *McDonnell*'s impact on this case. (R. Doc. 331). The Government opposed all of the motions in an Omnibus Opposition. (R. Doc. 337). With leave of the Court, both W. Reed and S. Reed filed Replies. (R. Docs. 341, 343). The

Court heard Oral Argument on the above Motions on October 5, 2016, specifically focusing on the import of *McDonnell*.

## II.     PRESENT MOTIONS

The post-trial motions filed by W. Reed and S. Reed are in some ways distinct. Accordingly, each Defendant's motion will be addressed in turn. However, because both Defendants seek the same relief, the Court will first address *in globo* the legal standards for each requested relief.

### A.     Legal Standards

#### 1.     Standard for Judgment of Acquittal

Rule 29 provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Further, "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1).

The Fifth Circuit has explained that in determining whether there is sufficient evidence to support a conviction, the court should "determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *United Sates v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992). "It is not necessary that the evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilty, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt." *Id.* (citing *United States v. Chavez*, 947 F.2d 742, 744 (5th Cir. 1991)).

In making this determination, the Court must "accept all credibility choices that tend to support the jury's verdict," recognizing that the jury was "free to choose among all reasonable constructions of the evidence." *United States v. Sneed*, 63 F.3d 381, 385 (5th Cir. 1995) (quoting *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991); *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992)). The courts have explained that the jury has the "unique role" of judging the credibility of witnesses and deciding how much weight to give each witness' testimony. *See United States v. Layne*, 43 F.3d 127, 130 (5th Cir. 1995) (citing *United States v. Higdon*, 832 F.2d 312, 315 (5th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988)). Furthermore, the Court must keep in mind that "[g]enerally speaking, '[w]hat a jury is permitted to infer from the evidence in a particular case is governed by a rule of reason, and juries may properly 'use their common sense' in evaluating that evidence.'" *United States v. Villasenor*, 894 F.2d 1422, 1425 (5th Cir. 1990).

### 2.   Standard for Arrest of Judgment

According to Federal Rule of Criminal Procedure 34, "the court on motion of a defendant, shall arrest judgment if the indictment or information does not charge an offense or if the court was without jurisdiction of the offense charged." Fed. R. Crim. P. 34.

### 3.   Standard for a New Trial

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice requires." This Rule also provides that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). The Fifth Circuit has stated that a court "should not grant a motion for new trial unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict." *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004). The Fifth Circuit

has stated that "motions for new trial are not favored, and are granted only with great caution." *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997) (citing *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977)). Unlike a motion for judgment of acquittal, when deciding whether to grant a new trial, the court may "weigh the evidence and may assess the credibility of the witnesses during its consideration." *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008) (quoting *United States v. Robertson*¸ 110 F.3d 1113, 1116 (5th Cir. 1997)).

### B.      W. Reed's Motions for Judgment of Acquittal and Arrest of Judgment and for a New Trial

W. Reed argues that he merits a judgment of acquittal under FRCP 29 or, in the alternative, an arrest of judgment under FRCP 34 because (1) the United States Attorney's Office does not have jurisdiction over the issues in this case and they therefore violated principles of federalism; (2) the wire fraud charges regarding the Open House, church donations, Thanksgiving dinners, the gift cards, the donations to St. Paul's High School, and the flowers purchase for Christine Curtis were insufficiently proven, and the evidence weighed in W. Reed's favor; (4) no rational jury would have convicted W. Reed for intentionally, knowingly, and willfully making false statements on his tax returns; (5) no rational jury would have convicted W. Reed for mail fraud for the legal work performed for the Hospital, and (6) the wire fraud charges should not have been based on violations of state campaign finance law and the two were inappropriately merged. (R. Doc. 261-1). W. Reed claims an arrest of judgment is warranted because this Court does not have jurisdiction over the campaign finance reporting of state political candidates.

The Government opposes W. Reed's motion, saying it mischaracterizes and ignores the evidence, is premised on arguments the jury rejected at trial, is an attempt to re-litigate issues the court already rejected, and fails to apply the proper standard for post-trial relief. (R. Doc. 337).

In the alternative, W. Reed seeks a new trial under F.R.Cr.P. 33 because of federalism concerns pervading the trial, the exclusion of critical evidence, the admission of improper evidence, the improper denial of a motion for severance, the lack of materiality of the income taxes owed, and prosecutorial misconduct. (R. Doc. 263-1 at 1).

The Government contends that W. Reed's Motion for a New Trial should be denied because the errors he alleges either did not occur or were harmless. (R. Doc. 337). The Court will discuss these issues in turn.

### 1.    Federalism (Counts 1-8 and 10)[2]

In the recent *McDonnell* decision, the Supreme Court unanimously overturned Virginia Governor Robert McDonnell's bribery conviction because of the federal government's over-expansive interpretation of the term "official act" in charging him with and convicting him of bribery codified at 18 U.S.C.S. § 201(a)(3). *McDonnell*, 136 S. Ct. 2355. The Court expressed concern that this overbroad interpretation would lead to sweeping federal prosecutorial power, and it could not "assum[e] that the government will use [that power] responsibly." *Id*. at 2373. In overturning Governor McDonnel's conviction, the Court stated that

> [t]he Government's position also raises significant federalism concerns. A State defines itself as a sovereign through 'the structure of its government, and the character of those who exercise government authority.' That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents. Here, where a more limited interpretation of 'official act is supported by both text and precedent, we decline to 'construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards' of 'good government for local and state officials.'

---

[2] S. Reed adopts and reiterates W. Reed's federalism arguments in his Motion for Judgment of Acquittal, Arrest of Judgment, and New Trial (R. Doc. 329-1 at 8-9) and deferred to Mr. Simmons' oral arguments on the issue. Accordingly, the Court extends its holding on this issue to S. Reed's motion as well and will not readdress it in the following section specific to S. Reed.

*Id.* at 2373 (internal citations omitted). Further, both public officials and the general public might be reticent to participate in the democratic process for fear of federal prosecution. *Id*. at 2372.

        (a)      <u>W. Reed's Arguments</u>

W. Reed seeks acquittal, arrest of judgment, or a new trial because the government breached the bounds of federalism when they prosecuted him for wire fraud.

W. Reed seeks to extend the unanimous *McDonnell* decision to this case, arguing that the same issues of federalism and prosecutorial overreach apply. He claims that the Government was overzealous in its prosecution and in prosecuting him, the Government is seeking a roundabout way to enforce the state campaign finance laws codified at La. R.S. 18:1505.2(I)(1). (R. Doc. 261-1 at 2). Accordingly, he argues this Court should follow the *McDonnell* court and rein in the Government's overzealous prosecution of state officials for fraud.

W. Reed claims that both *McDonnell* and this case raise similar vagueness concerns. Federal prosecution of state laws presents a vagueness problem because when two parties separately interpret the same law, "political figures will not know what they are supposed to do and what they are not supposed to do." *Id*. at 2 (citing Transcript of Oral Argument at 32, *McDonnell* 136 S. Ct. 2355). Like in *McDonnell*, the jury verdict in this case would leave Louisiana politicians "quaking in fear" because not only are they responsible for following state campaign finance law, they also must determine whether the *federal prosecutors* are sufficiently convinced that their spending is related to the campaign or to the holding of public office. If the federal prosecutors are unconvinced, state politicians may face federal fraud charges. This lack of guidance presents a classic vagueness problem.

There is also an issue of statutory interpretation in *McDonnell*. "A related concern is that, under the Government's interpretation, the term 'official act' is not defined 'with sufficient

definiteness that ordinary people can understand what conduct is prohibited,' or 'in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id*. at 2373, quoting *Skilling v. United States*, 561 U.S. 358, 364 (2010). Similarly, W. Reed argues "there is no federal law which clearly proscribes the conduct with which the defendant is charged…and there is no federal law which sets out the parameters of appropriate campaign spending for state political candidates." (R. Doc. 331 at 4, citing (R. Doc. 58 at 2-3)). Louisiana politicians are left without notice of their potentially criminal behavior or guidance as to how to avoid prosecution. W. Reed maintains that he believed, and continues to believe, that he followed Louisiana law but is nevertheless subject to federal prosecution for fraud.

The *McDonnell* court was also concerned with the federalism implications if federal prosecutors were permitted to conduct these types of prosecutions: "A State defines itself as a sovereign through 'the structure of its government, and the character of those who exercise government authority.' That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents." *McDonnell* 136 S. Ct. at 2373 (internal citations omitted). W. Reed argues that the jury's verdict in the present case makes federal prosecutors the final arbiter of Louisiana state campaign finance law. "The Department of Justice, and the Executive Branch, become the ultimate arbitrator of how public officials are behaving in the United States, States, local, and national." (R. Doc. 331 at 4). This is untenable under the tenants of federalism and under the recent *McDonnell* decision.

W. Reed argues that the Government rested their entire fraud case on the correct interpretation of state campaign finance law. Specifically, in deciding whether W. Reed was guilty of fraud for misusing campaign funds, the jury had to decide whether his expenditures were "related to the campaign" or "related to the holding of public office." La. R.S. §

11

18:1505.2(I)(a). W. Reed avers that this state law should be interpreted by the state legislature or the Louisiana Board of Ethics, not the United States Attorney's Office.

Though the Government claims they were prosecuting fraud, not state law, W. Reed argues their conduct at trial proved otherwise. To be found guilty of fraud the Government must prove that a misrepresentation occurred. In this case, the Government did not argue or attempt to prove that W. Reed made any specific misrepresentation to voters. On cross examination, donors to W. Reed's campaign acknowledged that they expected W. Reed to follow the law when spending campaign funds, and no evidence was presented at trial suggesting W. Reed made any false representations or promises to his donors. Instead of proving misrepresentation, the Government introduced W. Reed's state campaign finance reports and argued the contents were inaccurate, and his expenditures were therefore fraudulent. W. Reed argues that this suggests that the Government was not prosecuting a traditional fraud case, but rather rested their case on W. Reed's compliance with state law.

Before trial, this Court eliminated charges for ethics violations because they were not relevant to wire fraud or money laundering and they alluded to an un-charged scheme to defraud the public and the Louisiana Board of Ethics. W. Reed argues that, despite this pre-trial elimination, the Government continued to improperly prosecute ethics violations and infused the case with honest services fraud. W. Reed objects to the testimony of the Government's witness, Kathleen Allen, the Ethics Administrator and General Counsel to the Louisiana Board of Ethics. Though they did not qualify Ms. Allen as an expert witness, the Government questioned her about the types of expenditures allowed under the Louisiana statute, the purpose of requiring candidates to file reports, and the state's ability to adequately enforce their campaign laws. W. Reed argues the Government elicited improper opinion testimony from this non-expert witness

and, in so doing, demonstrated their desire to enforce the state's campaign laws in part because of the state's inability to do so.

Additionally, W. Reed argues that the Government revealed their intent to treat this case as an honest services fraud case through their questioning of CPA Ron Garrity about Ethics Board brochures and the purpose and process of campaign reports, and through their cross-examination of W. Reed when they asked about the campaign finance reports he submitted and his truthfulness on those forms. All of these actions taken together, according to W. Reed, demonstrate a reliance on state law, and show that the Government was actually prosecuting a state ethics case rather than a straightforward fraud case. The Government seeks to make state campaign finance a federal concern, which is impermissible under the tenants of federalism. Accordingly, W. Reed seeks an acquittal or arrest of judgment.

(b)   <u>The Government's Response</u>

The Government contests W. Reed's federalism argument, reasserting that the Government's fraud case does not rely wholly on state campaign finance law, nor is this case federal enforcement of state law. (R. Doc. 337). Instead, its theory at trial was that W. Reed "misled donors into thinking that their money would be used for one thing, and then he turned around and used it for other things. This is fraud." *Id*. at 26. While the Government agrees that state campaign finance law helps set a baseline for donor expectations, they argue that the case did not rely on W. Reed's compliance with those laws. At oral argument on these motions, the Government explained that a public official's compliance with state law is not the basis for guilt or innocence, but it may be a factor to consider when determining *mens rea*. That is, what W. Reed knew or believed about the legality of his expenditures.

Addressing *McDonnell*, the Government avers that W. Reed presents an overly-broad reading of the holding in that case. The Government argues that *McDonnell*'s holdings are limited to bribery charges and are inapplicable to the present fraud charges. *McDonnell*'s precedential value lies in its interpretation of the federal bribery statute, including what the government must allege and prove and what must be included in jury instructions when prosecuting a bribery case. In its holding, the Supreme Court focuses heavily on the definition of "official act" in the federal bribery statute. W. Reed's prosecutions were for fraud and money laundering, and the term "official act" is not included in either of those statutes. *See* 18 U.S.C. §§ 1341, 1343. Accordingly, the Government argues their prosecution was proper and does not implicate federalism.

(c) <u>Analysis</u>

Candidates and elected officials in Louisiana are bound by the provisions of the Campaign Finance Disclosure Act ("CFDA") codified under La. R. S. §§ 18:1481-1532. Specifically to this case, "funds shall not be used … for any personal use unrelated to a political campaign, the holding of a public office or party position, … except that excess campaign funds may be … given as a charitable contribution as provided in 26 USC 170(c), [or] given to a charitable organization as defined in 26 USC 501(c)(3)…" La. R.S. § 18:1505.2(I)(1).

Federal law criminalizes wire fraud. Anyone who, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire … in interstate or foreign commerce" is guilty of a crime. 18 U.S.C. § 1343. "To prove wire fraud under 18 U.S.C. § 1343, the government must prove: (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme." *United*

*States v. Dowl*, 619 F.3d 494, 499 (5th Cir. 2010) (quotation omitted). The "scheme" referenced

in the first element of 18 U.S.C. § 1341 must be one to deprive the alleged victim of money or

property. *See Ratcliff*, 488 F.3d at 645.[3]

      W. Reed does not dispute his use of wire communications, including through his use of

the banks. Accordingly, the only remaining issue is the existence of a scheme to defraud.

> The definition of a scheme to defraud is quite broad. As a learned
> judge of this Circuit once remarked in regard to the mail fraud
> statute, '[t]he law does not define fraud; it needs no definition; it is
> as old as falsehood and as versatile as human ingenuity.' The
> language of the mail fraud statute is sufficiently flexible to
> encompass any conduct 'which fails to match the reflection of moral
> uprightness, of fundamental honesty, fair play and right dealing in
> the general and business life of members of society.'

*United States v. Curry*, 681 F.2d 406, 410 (5th Cir. 1982) (citing *Blackly v. U.S.*, 380 F.2d 665,

671 (5th Cir. 1967)). That description is equally applicable to wire fraud.

      The Court addressed W. Reed's federalism arguments before trial, and maintains the

position detailed in its prior order. (R. Doc. 63). For the sake of completeness, the Court will

reiterate some of its earlier conclusions further supported by the facts revealed at trial.

      Defendants argue that federal regulation and enforcement of state campaign law runs

afoul of Supreme Court and Fifth Circuit precedent and violates Article X of the United States

Constitution, which mandates that the "powers not delegated to the United States by the

Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the

people." In support of this argument, Defendants point to the fact that while the State of

Louisiana has criminalized the conduct with which they are charged and has set out a detailed

procedure for enforcing the law by specifying allowable campaign expenditures, establishing a

---

[3] The exception to this rule is "honest services fraud" defined in 18 U.S.C. § 1346, which is not alleged in the Indictment.

procedure for investigating alleged violations, setting applicable civil and criminal penalties, and setting a statute of limitations, the state has not taken any action against either defendant. La. R.S. 18 § 1, et seq.

W. Reed avers that the Government's case depends on a finding that the expenses in the indictment were "unrelated" to W. Reed's campaign or his holding of public office. This determination, W. Reed argues, is, at its core, the interpretation of state law that does not implicate interstate commerce or individuals in other states and should not be interpreted by the United States Attorney's Office. A federal conviction for fraud, however, stands on its own; it is not predicated on an underlying state conviction. *See*, *United States v. Edwards*, 458 F.2d 875, 880 (5th Cir. 1972) (citing *Parr v. United States*, 363 U.S. 370, (1960) ("We likewise recognize, however, that the fact that a scheme may or may not violate State law does not determine whether it is within the proscriptions of the federal statute. Congress may forbid any mailing in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme itself or not."); *United States v. States*, 488 F.2d 761, 766–67 (8th Cir. 1973) (abrogated on other grounds) ("Nevertheless, the appellants argue that the application of the mail fraud statute to the facts of this case will result in a "policing" of state election procedure, and that Congress has never explicitly authorized such widespread intervention into state affairs. The appellants' argument misinterprets the purpose of the mail fraud legislation. The focus of the statute is upon the misuse of the Postal Service, not the regulation of state affairs, and Congress clearly has the authority to regulate such misuse of the mails.") (citations omitted); *United States v. Hanser*, 340 F.3d 1261, 1269 (11th Cir. 2003); *United States v. Keane*, 522 F.2d 534, 544–45 (7th Cir. 1975) ("A specific violation of state law, although covered by the statute . . . is not necessary to obtain a conviction for mail fraud."); *United States v. Smith*, 985 F. Supp. 2d 547,

606–07 (S.D.N.Y. 2014). Accordingly, the jury could convict W. Reed for fraud without

contemplating any violation of state campaign finance law. As the Eleventh Circuit explained:

> Pursuant to traditional norms of federalism, a federal court may not
> instruct state officials on how to conform their conduct to state law,
> because this power is reserved to the states. [However, t]he claims
> against Walker were not predicated on any violation of state law. In
> fact, the jury instructions specifically cautioned jurors *not* to decide
> whether Walker violated any state law, but to consider those laws
> only to the extent that the evidence indicated an intent to commit
> fraud on Walker's part. Moreover, an honest services mail fraud or
> mail fraud conviction does not require proof of a state law violation.
> . . . Thus, the jury could have found that Walker violated the mail
> fraud statutes by failing to disclose his relationship with the Medical
> College without considering the state ethics requirement.

*U.S. v. Walker*, 490 F.3d 1282, 1299 (11th Cir. 2007).

In an earlier Motion to Dismiss, Defendants cited related federalism concerns raised in

*Cleveland v. United States*, 531 U.S. 12 (2000) and *United States v. Ratcliff*, 488 F.3d 639 (5th

Cir. 2007). In its order, the Court rejected Defendants' argument that these cases stood for the

proposition that state officials could no longer be charged with federal criminal violations for

fraud committed in conjunction with state elections, holding that the federalism concerns

expressed in the *Ratcliff* and *Cleveland* cases were stated in dicta, were more narrowly focused,

and were not the basis for the holdings in those cases.

In *Cleveland*, the Supreme Court held that the mail fraud statute does not contemplate

false statements made in an application for a state lottery license. *Cleveland*, 531 U.S. at 15.

"Equating issuances of licenses or permits with deprivation of property would subject to federal

mail fraud prosecution a wide range of conduct traditionally regulated by state and local

authorities." *Id.* at 24. However, despite this language, the holding in *Cleveland* was predicated

on the fact that the alleged fraud did not deprive the state of "property" under § 1341 because a

video poker license has no value to the state prior to its issuance. The federalism concern expressed in *Cleveland* related specifically to the expansion of the definition of property.

In *Ratcliff*, the defendant was charged with using the mails in a scheme to defraud Livingston Parish of the salary and employment benefits of elected office by securing his reelection as parish president by obtaining illegal funding and concealing his violations from the Board of Ethics. 488 F.3d at 643. The Fifth Circuit held that the alleged misconduct could not constitute mail fraud because "the financial benefits budgeted for the parish president go to the winning candidate regardless of who that person is." *Id.* at 645; *see also United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006) (finding no deprivation of property "because the relevant salary would be paid to someone regardless of the fraud. In such a case, the citizens have simply lost the intangible right to elect the official who will receive the salary."). The parish would have had to pay the salary to whomever won the election and was therefore not deprived of any money or property by means of Ratcliff's misrepresentations. In other words, the scheme in *Ratcliff* was not "money or property fraud" cognizable under the mail fraud statute because the defendant's campaign finance misrepresentations "did not implicate the parish's property rights." *Ratcliff*, 488 F.3d at 645–46.

While *Ratcliff* warns that such an application "invites [the Court] to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress," it does not establish a blanket prohibition against federal prosecution of fraud committed under the auspices of a campaign for state office. *Id.* at 649. The *Ratcliff* court discusses its federalism concerns only in the final two paragraphs of the opinion and those concerns do not govern the court's holding. *See id.* at 648-49. W. Reed's case is distinct from *Ratcliff* holing because donors to W. Reed's campaign could have chosen not to donate to Reed's campaign. *See also United*

*States v. McMillan*, 600 F.3d 434, 449 (5th Cir. 2010) (interpreting *Ratcliff* as requiring "that the scheme be to defraud the victim insofar as victims were left without money that they otherwise would have possessed"). Protecting individuals who were defrauded of money they would have otherwise retained because of misrepresentations made to them about the purpose to which their money would be put is consistent with the conduct the federal fraud statute was intended to proscribe. *See Ratcliff* 488 F.3d at 649 (quoting *Cleveland*, 531 U.S. at 24).

Notably, *Ratcliff* was not the first time the Fifth Circuit considered the federalism implications of prosecuting conduct which simultaneously violated Louisiana election law and the federal mail fraud statute. In *United States v. Curry*, the chairman of a political action committee converted political contributions for personal use and gave false reports on the financial disclosures required under CFDA. 681 F.2d 406, 409 (5th Cir. 1982).[4] The Fifth Circuit found that the evidence was sufficient to uphold the convictions for mail fraud[5] and discussed the relationship between the federal mail fraud indictments and the state election law violations:

> The same conduct [giving rise to the mail fraud indictment] could also give rise to charges of state law violations. Thus, [the defendant] faced the possibility of being indicted under Louisiana law, for, inter alia, embezzling, and for 'knowingly and willfully' filing a false campaign report in violation of the Election Act's criminal provisions. However, '(t)he fact that a scheme may violate state laws does not exclude it from the proscriptions of the federal mail fraud statute....' Thus even when a state is itself the victim of a fraudulent scheme, and makes the scheme illegal under state law, the perpetrators may still be prosecuted under the federal mail fraud statute.

---

[4] The Fifth Circuit's statement in *Curry* that "a scheme to defraud need not necessarily contemplate loss of money or property to the victims" was later limited by the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 359 (1987). *See United States v. Herron*, 825 F.2d 50, 55n.6 (5th Cir. 1987) (recognizing that cases holding that defendants could be convicted of mail fraud for depriving citizens of intangible rights, such as the right to good government rather than only money or property, were limited by the *McNally* decision). However, *Curry* is still relevant for the proposition that violations of Louisiana campaign finance laws may also constitute fraud subject to federal prosecution without implicating federalism principles.

[5] The convictions were reversed on the grounds that the district court erred in refusing to provide the requested jury instruction. *Id*. at 408.

*Id.* at 411 n.11 (internal citations omitted) (quoting *Parr v. United States*, 363 U.S. 370, 389 (1960)).

Other circuits have also upheld federal fraud convictions for politicians who used campaign funds for personal purposes. For example, in *United States v. Henningsen*, the Seventh Circuit affirmed the mail fraud conviction of an alderman who failed to accurately account for campaign contributions and improperly used funds for personal expenses. 387 F.3d 585 (7th Cir. 2004). The defendant contended that he had never lied to campaign contributors, but only promised to seek re-election, and thus there could be no scheme to defraud. *Id.* at 589. The Seventh Circuit rejected this argument and instead found that a rational jury could have found, based upon the defendant's failure to accurately disclose revenue and expenditures in his campaign finance reporting, that the defendant's "solicitation of campaign funds for private use was dishonest, and that it influenced donors' decisions to contribute" so as to constitute a scheme to defraud. *Id.* at 589-90. The court concluded that "it makes no difference that [the defendant] may not have solicited each donor individually. Each person who gave to [his] re-election campaign and whose money was diverted for non-campaign expenses was a victim of his false representations." *Id.* at 590; *see also United States v. Walker*, 490 F.3d 1282, 1299 (11th Cir. 2007) (finding defendant's federalism claims had no merit and affirming mail fraud convictions of former state legislator for misusing campaign funds and other conduct which also violated state financial disclosure and ethics rules); *United States v. Delle Donna*, 552 F. Supp. 2d 475, 494 (D.N.J. 2008), *aff'd*, *United States v. Donna*, 366 F. App'x 441 (3d Cir. 2010) (denying motion to dismiss indictment for fraud when mayor's campaign contributions were expended for personal purposes).

While *Henningson* and *Delle Donna*, which involve the failure to report campaign contributions and expenditures entirely, concealing the fact that the candidate was receiving money at all, are factually distinct from the present case where W. Reed fully disclosed all campaign contributions and expenditures, these factual distinctions are inapposite to the question of whether the federal fraud statutes can criminalize conduct that is also penalized under state election laws. Criminal fraud cases are inherently factually pregnant. However, the fact remains that whether or not conduct violates state law, it may violate federal law. While Defendants are correct that the state could (and perhaps should) be the entity policing this alleged misconduct, this verity does not of itself preclude the federal government from doing the same.

The recent Supreme Court decision in *McDonnell v. United States* merits a second consideration of the issue of federalism in federal fraud prosecutions that also implicate state campaign or election laws. After careful consideration, this Court finds that neither *McDonnell* nor its progeny provide a sufficient basis to depart from the Court's earlier decision, and accordingly declines to grant W. Reed's motion for acquittal, arrest of judgment, or new trial following that opinion.

W. Reed rests his case on the federalism concerns raised in *McDonnell*. However, the crux of the Supreme Court's reasoning in that case is the definition of "official act" under the federal bribery statute, 18 U.S.C. §201(a)(3), which is not at issue in this case. 136 S. Ct. 2355. A review of *McDonnell*'s progeny also indicates that the precedential import of the case lies in that definition – many of the ensuing cases cite to the discussion of "official act," the requirement of quid pro quo, and statutory interpretation.[6]

---

[6] *See United States v. Madison*, No. 15-3456, 2016 U.S. App. LEXIS 19232, at *3 (2d Cir. Oct. 25, 2016); *United States v. Halloran*, Nos. 15-2351(L), 15-2433(Con), 2016 U.S. App. LEXIS 18847, at *10 (2d Cir. Oct. 20, 2016); *United States v. Jones*, No. 5:15-CR-324-F-1, 2016 U.S. Dist. LEXIS 127113, at *6 (E.D.N.C. Sep. 19, 2016) (foregoing a discussion of *McDonnell* because, though the instant case was a bribery case, it did not require an

Nevertheless, in dicta the *McDonnell* court does raise some of concerns about federalism and prosecutorial power that may be relevant to the instant case and should be addressed. Expressing its concern about prosecutorial overreach, the *McDonnell* court states: "[w]e cannot construe a criminal statute on the assumption that the Government will use it responsibly." *McDonnell*, 136 S. Ct. at 2372-73 (internal citation omitted); s*ee also United States v. Nosal*, 828 F.3d 865, 896 (9th Cir. 2016) (Reinhardt, J., dissenting); *United States v. Chin*, No. 14-10363-RGS, 2016 U.S. Dist. LEXIS 137776, at *15 (D. Mass. Oct. 4, 2016) (citing *McDonnell* to demonstrate the danger of "overly aggressive and unbounded readings of statutes [producing] distorted results"). The D.C. Circuit addressed the same issue in a case following *McDonnell*.

> The absurdity of the CFPB's position is illustrated by its response to a hypothetical question about the CFPB's bringing an administrative enforcement action 100 years after the allegedly unlawful conduct. Presented with that question, the CFPB referenced its prosecutorial discretion. But 'trust us' is ordinarily not good enough. Cf. McDonnell v. United States, 136 S. Ct. 2355, 2372-73, 195 L. Ed. 2d 639 (2016).

*PHH Corp. v. Consumer Fin. Prot. Bureau*, No. 15-1177, 2016 U.S. App. LEXIS 18332, at *139 (D.C. Cir. Oct. 11, 2016).

To further elucidate the import of *McDonnell*'s to the instant case, the Court asked both parties to focus their oral arguments on their interpretations of *McDonnell*'s significance to this case, and to bring that interpretation to its logical conclusion. For example, is the federal government prohibited from *ever* charging state officials with fraud if state campaign law is also

---

interpretation of the term 'official act'); *United States v. Stevenson*, No. 14-1862-cr, 2016 U.S. App. LEXIS 15075, at *7 n.1 (2d Cir. Aug. 17, 2016); *United States v. Silver*, No. 15-CR-093 (VEC), 2016 U.S. Dist. LEXIS 114189, at *17 (S.D.N.Y. Aug. 25, 2016); *United States v. Fattah*, No. 15-346, 2016 U.S. Dist. LEXIS 145833, at *41-42 (E.D. Pa. Oct. 20, 2016); *United States v. Jones*, No. 5:15-CR-324-F-1, 2016 U.S. Dist. LEXIS 127113, at *6-12 (E.D.N.C. Sep. 19, 2016); *United States v. Pomrenke*, No. 1:15CR00033, 2016 U.S. Dist. LEXIS 100016, at *133 (W.D. Va. Aug. 1, 2016) ("The issue in the *McDonnell* decision was 'the proper interpretation of the term "official act"' as used in 18 U.S.C. § 201."); *United States v. Arnold*, No. 3:16-00117, 2016 U.S. Dist. LEXIS 136003, at *2 (M.D. Tenn. Sep. 30, 2016); *United States v. Bills*, No. 14 CR 135-1, 2016 U.S. Dist. LEXIS 119519 (N.D. Ill. Aug. 29, 2016); *State v. Holle*, 240 Ariz. 301, 379 P.3d 197, 207 (2016).

at issue? If the state official's actions were deemed legal by the state enforcement body, could the federal government still charge that official with fraud? Inversely, if the state enforcement body deemed a state official's actions illegal, is that a *per se* violation of the federal fraud statute? Further, if the state enforcement body determined the official's expenditures were not in violation of state law, who determines whether they are fraudulent under federal law? At oral argument, the Government clarified its position: the jury ultimately determines whether or not a defendant committed fraud. While state campaign finance law, interpretation of that law by the governing body, and a defendant's CFDA submissions may be admissible in a fraud case, the weight of that evidence goes to *mens rea*, not to whether or not defendant's actions were fraudulent. W. Reed, on the other hand, maintained the inappropriate intervention of the federal government in this matter, but indicated that an extreme case may exist wherein the federal government could prosecute a state official for fraud.

In this case, the jury heard a plethora of evidence, including evidence about Louisiana state campaign finance law, W. Reed's CFDA submissions, and testimony from donors and others who knew W. Reed. Ultimately, despite W. Reed's testimony and evidence suggesting his expenditures were, or he believed they were, legal and appropriate, the jury disagreed and found him guilty. *McDonnell* and its progeny suggest the U.S. Attorney's Office cannot be the final word on the interpretation of federal criminal statutes. However, those cases do not make the federal fraud statutes inapplicable in all instances to state office holders or those who campaign for state offices. The holdings in *McDonnell* and *Ratcliff* are limited to the facts in those cases.

In the present case, the jury heard W. Reed admit his guilt to a portion of Count 5 of the Indictment, which charged him with wire fraud for the campaign funds he spent sending flowers to Melissa Frasier. He testified as follows: "[y]ou know, I should have paid for those flowers. I

should have. They went on the flower fund. Ms. Jean wrote the check. I should have paid for those myself. She lives [outside of my district], and that [payment] wasn't justified." (R. Doc. 313 at 38). Later, on cross-examination, he states: "I shouldn't have sent the girl flowers. I shouldn't have paid for it with campaign funds." *Id*. at 153.

Regarding other instances where he purchased flowers, W. Reed testified that sending of flowers to his aunts, his girlfriend's mother, and ex-wife was appropriate because they were related to his campaign or the holding of public office. (R. Doc. 313). The jury apparently did not believe him.

Finally, with regard to a campaign gift from W. Reed to Reverend Jerry Cox for some $25,000, the jury apparently concluded that it was not a donation related to the holding of public office as urged by W. Reed, but was instead a kickback related to the referral of a civil case to W. Reed in his private capacity. These are only a few instances distinguishing the present case from *Ratcliff* and *McDonnell.*

In any event, this case does not present the same jury issue as did *McDonnell*. In *McDonnell*, the jury was forced to determine guilt despite jury instructions containing an overbroad definition of a term in the statue of conviction. 136 S.Ct. at 2358. The fraud statutes in the present case does not require that same degree of technical interpretation, like the definition of "official act," that the bribery statute required in *McDonnell*. There is no federal law setting out the parameters of appropriate campaign spending for state political candidates. And, as mentioned above, fraud "needs no definition" and is "sufficiently flexible to encompass any conduct which fails to match the reflection of more uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *Curry* 681 F.2d at

410 (internal quotations omitted). Accordingly, neither the jury instructions nor the jury's ability to make an informed decision based on the fraud statute are of concern here.

While the federal enforcement of state law can raise significant federalism concerns, the Court finds that the federal government, in this case, enforced federal law – namely the federal fraud statute – and used state law only to prove *mens rea* and donor expectations, that is, W. Reed's misrepresentation in the course of a fraudulent scheme. The essence of federal prosecution is, in part, its discrete ability to enforce federal laws regardless of what is criminalized under state law. This is especially salient given that criminal law may differ significantly from state to state, while the federal law remains applicable across the country. While the wisdom of federal prosecution of state officials for campaign-related activities is controversial and the defendants raise valid points, it is not within the purview of this Court, which is cabined to the facts of this case, to prohibit the enforcement of federal fraud statutes in all instances involving campaigning for or the holding of state offices. A strong argument can be made, as Defendants have done, for the proposition that allowing a federal prosecutor to pursue state officeholders on any campaign fund issue will have a chilling effect on those who seek state elective office in the future and should not be permitted. But a blanket exemption of all campaign contributions to state officeholders from the enforcement of the federal fraud statutes is not supported by the current state of the law. Instead, under the current law, each case is dependent on its own facts, and the facts in this case, as established by the evidence, support the jury's finding of a violation of the federal wire and mail fraud statutes. Perhaps the appellate court, in the future, may conclude that the federal fraud statutes have no place in any campaign activity of state officeholders, as urged by Defendants. This is a result, however, that is beyond the power and scope of a federal district court and is better determined by a more policy-based

court such as the Fifth Circuit Court of Appeals or the Supreme Court. Accordingly, Defendant's

Motion for Acquittal, Arrest of Judgment, and New Trial on this ground must be denied.

> **2.      Sufficiency of the Evidence – the Open House (Count 1), Thanksgiving Dinners (Count 4), church donations (Counts 2, 6, 8), Gift cards (Count 1, 11-14), St. Paul's High School (Counts 11-14), and Flowers to Christine Curtis (Count 5).**

> (a)      <u>W. Reed's Arguments</u>

W. Reed avers that the Government had insufficient evidence to prove that his use of

campaign funds was fraudulent when spent on the Open House event (Count 1), for church

donations, on the Thanksgiving Dinner (Count 4), to purchase gift cards (Count 1 and 11-14), for

donations to St. Paul's High School, and for flowers sent to Christine Curtis (Count 5). In order

to convict W. Reed of wire fraud for these charges, the jury would have to find that none of these

events were related to the campaign or the holding of public office, as is required under the

CFDA. W. Reed argues the Government presented insufficient evidence to prove the

expenditures were not related to the campaign or holding of public office, and that the

Government accordingly misrepresented the evidence.

*Open House*

The Open House, W. Reed argues, was held to honor campaign contributors and

volunteers. (R. Doc. 261-1 at 12-15). The party's guests included other politicians, volunteers,

and his biggest supporters and contributors, including those in his "Breakfast Club," who met

regularly to discuss both W. Reed's campaign and his work as a District Attorney. The guest list

suggests the party was held in connection to W. Reed's campaign or his holding of public office.

*Thanksgiving*

W. Reed argues that in order to promote political good-will and positive relationships, .he

hosted Thanksgiving dinner parties for his supporters and employees who had nowhere else to

spend the Thanksgiving holiday. (R. Doc. 261-1 at 15-16). Accordingly, W. Reed argues the event was clearly connected to the campaign or holding of public office, and he merits an acquittal.

<u>Church Donations</u>

W. Reed's avers that his donations to churches and for church events were charitable contributions and in furtherance of his campaign or holding of public office. (R. Doc. 261-1 at 24-25). He argues that the support of local churches is imperative for politicians in his area, and the CFDA specifically allows for charitable contributions. He alleges that, had the Court permitted Gray Sexton to testify about dual-purpose expenditures, he would have explained that any reciprocal benefit W. Reed received from these donations was irrelevant, provided the contributions had at least one campaign-related purpose. Further, W. Reed avers that because he donated the money to finance the gymnasium in Faith Tabernacle Church more than fifteen months after he received a referral case from Faith's Pastor, Cox, it is clear that the money was a donation and was not related to Cox's referral of a case to W. Reed's law firm. Cox's testimony at trial regarding W. Reed's purpose for donating the money was inappropriately speculative and should not have been admitted, especially given the Court's limitation of Mr. Sexton's testimony.

Regarding the preacher dinner in Count 6, W. Reed avers the dinner included various pastors from the parishes within his electoral district, and he paid for the dinner to support local religious organizations, not to drum up business for his private legal practice. Finally, W. Reed argues that because the expenditures in Count 2 were in error and were returned prior to Indictment, he should not have been convicted on this count.

<u>Gift Cards</u>

Because the Government could not or did not prove how he used the gift cards he purchased with campaign funds, W. Reed argues the Government failed to prove that it was a misuse of campaign funds to purchase those gift cards. (R. Doc. 261-1 at 16-18). Purchasing gift cards is not a *per se* violation of the CFDA. Accordingly, the Government should have proven that the gift cards purchased with campaign funds were also not used in connection with the campaign or holding public office. Because they did not, W. Reed argues the Government did not provide sufficient evidence to convict W. Reed on these counts, and W. Reed merits acquittal.

### *St. Paul's High School*

W. Reed also argues that no rational jury could have convicted him of fraud for his donations to his St. Paul's High School. (R. Doc. 261-1 at 26-27). He alleges his donations to St. Paul's, including paying for dinners for the wrestling team, were charitable and were clearly unconnected to his son's attendance because the donations began before his son attended St. Paul's. At trial, Craig Ketelsen from St. Paul's testified that W. Reed was a devoted supporter who was not working an angle or looking for special treatment for his son. W. Reed argues that had Gray Sexton been permitted to testify about the Board of Ethics' advisory opinions on charitable giving, he would have said that donations similar to this one are considered related to the holding of public office. W. Reed's inability to put on a complete defense resulted in reversible error and merit his acquittal.

### *Flowers*

Additionally, W. Reed claims the flowers he sent to Christine Curtis, a campaign supporter and well-known real estate agent, were related to the campaign. (R. Doc. 261-1 at 27-29). Witnesses testified at trial that Ms. Curtis and W. Reed together attended the Angola Rodeo,

a state function that supports the rehabilitation of prisoners, and then toured Angola and met with high-ranking prison officials. W. Reed sent Ms. Curtis flowers as a thank you for attending the event with him and in the hopes of her becoming a campaign supporter and contributor which she did. Accordingly, the flowers W. Reed sent from his campaign funds were clearly related to the campaign and a rational jury could not have found otherwise. Further, the sending of reasonably-priced flowers was sanctioned by the Louisiana Board of Ethics in their Advisory Opinion 98-232. Accordingly, W. Reed avers there is no doubt the flowers he sent to Ms. Curtis were appropriate expenditures and he merits acquittal on this count.

Evidence was elicited at trial that all of the above expenditures were part of W. Reed's campaigns or his holding of public office, and W. Reed argues he deserves acquittal on these counts.

(b)      The Government's Arguments

The Government contends that W. Reed's arguments on the sufficiency of the evidence regarding the Open House, the Thanksgiving dinners, church donations, the gift cards, the donations to St. Paul's High School, and the flowers sent to Christine Curtis are objections to specific items of proof, not the sufficiency of the evidence in total, and therefore do not merit relief under Rule 29 or 34. (R. Doc. 337 at 23-25).

Even if the Court found W. Reed's arguments meritorious, the Government avers this finding would still not upset the guilty verdict. W. Reed does not contest *all* of the acts or the sum of the evidence regarding the conspiracy (Count 1)[7] or the purchase of flowers Count 5), just the quantum of proof for specific overt acts that comprise Counts 1 and 5. Therefore, his arguments do not undermine the verdict and are insufficient for relief under Rule 29.Further, the

---

[7] W. Reed's arguments about the Open House and gift cards fall under Count 1.

Government avers that W. Reed's arguments focus on the evidence *most favorable* to his case and fail to view the evidence in the light most favorable to the verdict, as required under Rule 29. (R. Doc. 337 at 31-41).

The Government highlights that in making its guilty finding, the jury was not required to tell the Court upon which evidence it based its determination. To find W. Reed guilty, the jury only needed to find he had committed *at least one* of the twenty-one overt acts at issue in the Open House charge, and it was not required to inform the court upon which overt act it relied. *See, e.g., Hoover v. Johnson*, 193 F.3d 366, 370-71 (5th Cir. 1999); *Jolley v. United States*, 232 F.2d 83, 88 (5th Cir. 1956). The same is true for W. Reed's arguments on the sufficiency of the evidence related to the purchase of gift cards, the donation to St. Paul's, and the flowers purchased for Ms. Curtis.

The Government also avers that W. Reed focused on the evidence most favorable to him when arguing that the Thanksgiving Dinners were campaign-related events, and failed to address the evidence presented at trial that the Thanksgiving dinner was a family affair. The Government points to various witness testimony that W. Reed did not address in his arguments. The jury weighed this evidence as well as the evidence upon which W. Reed now relies. W. Reed's arguments incorrectly apply the standard for a Rule 29 motion.

Regarding the money W. Reed gave to certain churches and church functions, the Government argues that W. Reed conflates donations with contributions, and that not all money given to a religious institution qualifies as a gift. Further, the Government contends that an act may be a violation of federal law even if it is permissible under state law. Accordingly, Gray Sexton's testimony would have irrelevant. After weighing all the evidence, including evidence that the money was given to the church for referrals made to W. Reed's private legal practice, the

jury determined that the money W. Reed gave to religious organizations were not donations and should not have been paid with his campaign funds.

In all, the Government argues that W. Reed rests his argument on the evidence most favorable to him and fails to address the weight of evidence against him at trial. He presents an alternate interpretation of the evidence that the jury ultimately rejected. Further, the arguments he makes, if true, do not undermine the verdict. Weighing the evidence and inferences in the light most favorable to the verdict, the Government argues that W. Reed's Motion for Acquittal should be denied.

(c)     Analysis

Many of W. Reed's arguments rely on the sufficiency of the evidence presented at trial. Specifically, he argues that no rational jury could have convicted him on the charges related to the Open House, the Thanksgiving Dinners, the church donations, the donations to St. Paul's high school, the gift cards, and the flowers sent to Christine Curtis.

When determining whether there is sufficient evidence to support a conviction, the court should "determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *United Sates v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992). The jury has a unique role of judging the credibility of witnesses and determining how much weigh to give each witness; testimony. *See United States v. Layne*, 43 F.3d 127, 130 (5th Cir. 1995) (citing *United States v. Higdon*, 832 F.2d 312, 315 (5th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988)). Accordingly, the Court must "accept all credibility choices that tend to support the jury's verdict," recognizing that the jury was "free to choose among all reasonable constructions of the evidence." *United States v. Sneed*, 63 F.3d 381, 385 (5th Cir.

1995) (quoting *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991); *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992)).

In making the above arguments, W. Reed focuses primarily on the evidence most favorable to him. However, the jury heard this evidence at trial along with other evidence the Government introduced that was less favorable to W. Reed's case. For example, regarding the Thanksgiving dinner, W. Reed fails to take into account the testimonies of Melissa Skillingstad who testified as to an email sent to her by W. Reed concerning the Thanksgiving Dinner (R. Doc. 309 at 274-75), Gina Higgins (R. Doc. 308 at 165-66), Kenneth Lacour (R. Doc. 308 at 171-73), and Ronald Garrity (R. Doc. 309 at 221), whose testimonies all suggest the dinners were thrown for W. Reed's family and friends. The jury considered all of this testimony and found that W. Reed committed wire fraud by spending campaign money on personal Thanksgiving dinners. The jury also heard the testimony of Ms. Curtis, to whom W. Reed sent a bouquet of flowers after she attended the rodeo with him. She testified that the note accompanying the flowers – "To my rodeo girl from a secret admirer from Camp J" – made her uncomfortable. (R. Doc. 252 at 9-10). The Court does not presume to know upon what evidence the jury relied or how they interpreted the evidence. However, given the entirety of the evidence presented at trial, this Court finds that it was not unreasonable for a jury to find W. Reed guilty.

It merits noting that Count 5 charges the Defendant with wire fraud for the $614.49 he spent at "Flowers N. Fancies." While the flowers to Christine Curtis make up a portion of that amount, W. Reed also purchased flowers for other people that are included in this charge. He does not now contest those purchases, and even admitted to the impropriety of one of the purchases at trial: "You know, I should have paid for those flowers. I should have. They went on

32

the flower fund. . . . I should have paid for those myself. She lives somewhere else, and that wasn't justified." (R. Doc. 313 at 38).

Further, regarding W. Reed's argument that the Government did not meet its burden of proof as to the Open House and gift cards – included in the conspiracy charge (Count 1) – the Court instructed the jury that they need only find that the Defendants had committed at least one of the twenty-one alleged overt acts alleged in the indictment. (R. Doc. 241 at 17-23, 32-34). Only two of those overt acts concerned the Open House. Accordingly, even if W. Reed's argument that the evidence was insufficient to convict him for fraud concerning the Open House, there are still nineteen remaining overt acts upon which the jury could have rendered its verdict. *Jolley v. United States*, 232 F.2d 83, 88 (5th Cir. 1956) ("Nor was it necessary that the evidence establish the appellant's guilt of each and all of the overt acts charged, but only of the commission of any one or more thereof to effect the objects and purposes of the conspiracy."). The same is true for his arguments regarding the donations to St. Paul's, and purchase of flowers as they relate to the charges of tax fraud in Counts 11-14. Further, the total loss amount in those Counts was not an element of the crime, and arguments about that amount will be addressed at sentencing. Accordingly, W. Reed's arguments on Counts 1 and 11-14 are not sufficient to overturn the verdict.

W. Reed also argues that his payments to certain churches and for certain church functions were permissible donations, and therefore the evidence was insufficient to prove his guilt. As this Court held in a previous order denying motions to strike, dismiss, and for reconsideration, although Louisiana campaign finance laws allow for the charitable gift of campaign funds to non-profit religious entities,

> …not all payments to charities or religious organizations are gifts. *See United States v. Terrell*, 754 F.2d 1139, 1149 n.3 (5th Cir. 1985) (affirming conviction and upholding jury instruction on the

> definition of "gift" that stated, "[t]he characterization given to a certain payment…is not conclusive," and that payment is not a "gift" if, *inter alia*, it is made to compensate another or with the intent to receive anything in return for it). The fact that Walter Reed says the payment was a gift, that he listed the payment on his state campaign filings as a donation, or that the money went to a non-profit religious organization, does not necessarily make it so. After seeing the evidence, hearing the testimony, and assessing the credibility of the witnesses, the jury will decide Walter Reed's intention in making the payment.

(R. Doc. 93 at 24). In his Motion, W. Reed does not address certain evidence the jury considered in making its determination. Specifically, the testimony of Jerry Cox that he had referred numerous cases to W. Reed, that W. Reed was the only person to pay for dinners like the one held at Gerald's in Count 2, and that the dinner included people W. Reed sought to have as clients for his firm. (R. Doc. 309 at 170-72; Tr. Ex. 87). Cox also testified that, having referred a personal injury case to W. Reed and the firm with which W. Reed was affiliated, he sought a referral fee from the managing partner of W. Reed's law firm and was denied because such fees were "illegal" and "unethical." He then sought a referral fee from W. Reed, and W. Reed gave $25,000 of his campaign money to the church to build a gym (Count 8). Though W. Reed argues the payment was unrelated to the case referral, the jury clearly disagreed. Further, Pastor Joel Holmes provided damning testimony as to Count 6, testifying that W. Reed had run an advertisement in a Pentecostal magazine and that W. Reed had received numerous clients through referrals from Pentecostal ministers. (R. Doc. 310 at 29-34). Further, Holmes was not from Louisiana and was not eligible to vote for W. Reed, but he did refer legal work to him after that event. *Id*. The jury weighed the evidence presented at trial and found W. Reed guilty of fraud as it relates to the campaign money given to churches and for church events.

It is the jury's unique role to determine the credibility of witnesses and to weigh the sufficiency of the evidence, and the Court must accept those decisions and view the evidence in

the light most favorable to the verdict. Accordingly, while W. Reed puts forward a feasible interpretation of certain evidence – an interpretation he also presented at trial – the jury ultimately did not find it credible. Viewing the evidence in the light most favorable to the verdict, the Court finds the jury's verdict reasonable.

It would be inappropriate for this Court, post-trial, to re-weigh the evidence and overturn the verdict simply because another interpretation of the evidence is possible. The Court must view the evidence in the light most favorable to the verdict, and, having done so, the Court finds the jury's determination rational. The jury's determination on these counts is therefore upheld. Accordingly, W. Reed's Motion for Acquittal or Arrest of Judgment on this basis is denied.

### 3.     The Tax Returns

#### (a)     W. Reed's Arguments

W. Reed argues that he should be acquitted on Counts 11-14 which charge him with making materially false statements on his income tax returns from 2009-2012. (R. Doc. 261-1 at 18-23). Alternatively, he argues he merits a new trial on those charges. (R. Doc. 263). He argues that no rational jury could have convicted him of intentionally, knowingly, and willfully making materially false statements on his tax returns because the miscalculation was done in error. Further, underreporting his income was not material to the case at hand.

W. Reed argues that his failure to properly report his income in charges 12-14 was unintentional because he believed his campaign expenditures to be proper and legal. Accordingly, he did not consider the amount to be income and did not report it as such. W. Reed argues that because he lacks the requisite intent to convict he should be acquitted on these counts.

As to Count 11, the underreported income came from a $48,000 referral fee that W. Reed claims was mistakenly recorded as $18,000 due to illegible handwriting. Because the

underreported income was done in error, W. Reed avers it was not intentional, knowing, or

willful, and he should be acquitted on that count. Further, the referral fee came from attorney,

James Marchand, and had nothing to do with W. Reed's work for the hospital. Accordingly, it

had nothing to do with the conspiracy or fraud charges in this case and was inappropriately

included.[8]

Finally, W. Reed avers the tax charges lack materiality. Because the IRS has a

permissible margin of error and because the IRS requires the underreporting of income to be

material in order to be criminal, the tax charges should be dismissed. The amount alleged is, at

most, under 5% of his income and under 10% of the amount of taxes paid from 2009-2012. *See*

Trial Exhibits WR-117 and WR-119. W. Reed also maintains that he should not be liable for

unpaid taxes on the $40,000 mistake in Count 11; the $26,000 spent on the Open House Party,

which he avers was campaign-related; or the $9,000 of medical reimbursements that he claims

the prosecution did not prove were taxable. W. Reed argues that because he did not have the

requisite *mens rea*, Count 11 had nothing to do with the conspiracy, and the amount lacks

materiality, he merits an acquittal or new trial on Counts 11-14.

(b)     The Government's Arguments

The Government contests all of W. Reed's arguments. First, they argue that while W.

Reed disputes the amount of tax deficiency in Counts 11-14, this is not an element of the crime

and the jury was not determining a loss amount. (R. Doc. 337 at 25 (citing the Court's jury

instructions at (R. Doc. 241 at 32-33)). Accordingly these arguments lend no support to

overturning the guilty verdict and therefore fail. The Government argues that disputes over dollar

---

[8] The Government originally charged the $30,000 underreported income as money from St. Tammany Parish Hospital, but the charge was later amended to reflect that the money came from Marchand. There is no dispute that W. Reed paid taxes on the money he received from the Hospital, nor does the Government aver the money from Marchand was related to the campaign.

amounts, such as the amount of tax deficiency, are more appropriate for the sentencing and restitution rather than the guilt phase. At that time, this Court will consider the loss amount and its implication on W. Reed's sentence and restitution. Accordingly, W. Reed is not entitled to relief under Rule 29 for these arguments.

Further, the Government avers that W. Reed focuses on the evidence most favorable to the defense and fails to view the evidence in the light most favorable to the verdict, as required when determining whether a Motion for Acquittal should be granted. (R. Doc. 337 at 31-41). His argument is merely another interpretation of the evidence – one the jury rejected. The Government evidence produced at trial showed that W. Reed never gave his accountant either the $48,000 check or the 1099 from Marchand. (R. Doc. 309 at 249-51); Tr. Ex. 98.03, 98.04. Further, W. Reed's accountant testified that W. Reed told him the amount was $18,000. *Id*. The jury considered all of the evidence at trial and did not believe W. Reed's "miscalculation" was an innocent mistake on Count 11.

The Government also contests that W. Reed's failure to report tax income related to campaign expenditures (Counts 12-14) was inadvertent, unintentional, and immaterial. This argument, they aver, is again an alternate interpretation of the evidence with which the jury ultimately disagreed. The Government presented evidence demonstrating willfulness and intent, including testimony of W. Reed's accountant, Ronald Garrity, of Jerry Reed, and of W. Reed himself. (R. Docs. 309 at 245-46, 257-58 and 307 at 9-10); Tr. Ex. 130, 131. Through their testimonies, the Government demonstrated W. Reed's *mens rea*, specifically as it relates to underreporting his taxes using his campaign expenditures and health reimbursement. After weighing all the evidence presented, the jury found the requisite *mens rea* and chose to convict.

Further, while W. Reed argues the tax amounts are immaterial, there is no threshold for materiality in the Fifth Circuit, and W. Reed fails to legally support for his argument that the amount at issue was immaterial. (R. Doc. 337 at 34-35); s*ee*, *e.g.*, *United States v. Foster*, 229 F.3d 1196, 1197 (5th Cir. 2000). The Government cites to the Fifth Circuit Pattern Jury Instructions, which define materiality as having "a natural tendency to influence, or [be] capable of influencing, the Internal Revenue Service in investigating or auditing a tax return or in verifying or monitoring the reporting of income by a taxpayer." Fifth Circuit Pattern Jury Instruction 2.102A. The Government's evidence at trial demonstrated the amount W. Reed failed to report, and the jury found it material. (Tr. Ex. 142-46).

In all, the Government argues that W. Reed seeks to reintroduce issues already litigated at trial and rests his argument on the evidence most favorable to him. The jury, however, weighed that evidence along with other evidence introduced by the Government and found W. Reed guilty. Weighing the evidence and inferences in the light most favorable to the verdict, the Government argues that W. Reed's Motions for Acquittal and New Trial should be denied.

(c)      Analysis

Many of W. Reed's arguments rely on the sufficiency of the evidence presented at trial. When determining whether there is sufficient evidence to support a conviction, the court should "determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *United Sates v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992). The jury has a unique role of judging the credibility of witnesses and determining how much weigh to give each witness; testimony. *See United States v. Layne*, 43 F.3d 127, 130 (5th Cir. 1995) (citing *United States v. Higdon*, 832 F.2d 312, 315 (5th Cir. 1987), *cert. denied*,

484 U.S. 1075 (1988)). Accordingly, the Court must "accept all credibility choices that tend to support the jury's verdict," recognizing that the jury was "free to choose among all reasonable constructions of the evidence." *United States v. Sneed*, 63 F.3d 381, 385 (5th Cir. 1995) (quoting *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991); *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992)).

In making his arguments, W. Reed again focuses primarily on the evidence most favorable to him. However the jury heard this evidence at trial, along with other evidence the Government introduced that was less favorable to W. Reed's case. As previously stated, it is the jury's unique role to determine the credibility of witnesses and weigh the sufficiency of the evidence, and the Court must accept those decisions and view the evidence in the light most favorable to the verdict. Accordingly, while W. Reed puts forward a feasible interpretation of the evidence – an interpretation he also presented at trial – the jury ultimately did not find it credible.[9] The Court cannot, post-trial, re-weigh the evidence and overturn the verdict simply because another interpretation of the evidence is possible. The Court must view the evidence in the light most favorable to the verdict, and, having done so, the Court finds the jury's determination rational. The jury's determination on these counts is therefore upheld. Accordingly, W. Reed's Motion for Acquittal, Arrest of Judgment, or new trial on this basis is denied.

---

[9] The Court instructed the Jury that "[w]illfully means that the act was committed voluntarily and purposefully, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey, disregard or circumvent the law. If a person in good faith honestly believes that his income tax return truthfully reports his taxable income and allowable deductions, that person cannot be guilty of willfully filing a fraudulent return." Jury Instructions, Rec. Doc. No. 241.

4.     **The Hospital**

(a)     <u>W. Reed's Arguments</u>

W. Reed argues that because he never made any misrepresentation regarding the funds he received for his representation of the Hospital, there was insufficient evidence to convict him of mail fraud on Counts 15-19 and he merits a judgment of acquittal. (R. Doc. 261-1 at 29-32). Each year, W. Reed publicly disclosed his financial receipts to the Board of Ethics and paid taxes on the amount earned. He also argues that he could have and would have raised his salary if he were representing the Board in his official capacity. He chose not to, and his decision saved the office the 7% retirement benefits he would otherwise be owed. Instead, he represented the Board in his private capacity and received the funds to which he was entitled. Because there was no misrepresentation, W. Reed argues there was no fraud and no rational jury could have convicted him.

(b)     <u>The Government's Arguments</u>

The Government opposes W. Reed's argument that the evidence was insufficient to convict him on the Hospital charges. (R. Doc. 337 at 38-41). The Government contends that the many pieces of evidence presented at trial convinced the jury that W. Reed was not representing the hospital in his personal capacity and should not have kept the money intended for the Office of the District Attorney. This evidence includes, among other things, contracts between the District Attorney and the Hospital and the fact that W. Reed would send his subordinates to Hospital board meetings yet did not pay them any more for their work and therefore must not have been doing contract work for W. Reed's private firm. *Id*. W. Reed argued all of his points at trial. The jury weighed the evidence and ultimately did not believe W. Reed's theory of the case. The Government argues that he should not be able to relitigate these issues now. Weighing the

evidence and inferences in the light most favorable to the verdict, the Government argues that W. Reed's Motion for Acquittal should be denied.

(c)     Analysis

W. Reed again centers his argument on the sufficiency of the evidence presented at trial, specifically that the evidence was insufficient to support a finding of guilt for the mail fraud charge charges in Counts 11-14.

When determining whether there is sufficient evidence to support a conviction, the court should "determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *United Sates v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992). As the Court has recognized several times now, the jury has a unique role of judging the credibility of witnesses and determining how much weigh to give each witness; testimony. *See United States v. Layne*, 43 F.3d 127, 130 (5th Cir. 1995) (citing *United States v. Higdon*, 832 F.2d 312, 315 (5th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988)). Accordingly, the Court must "accept all credibility choices that tend to support the jury's verdict," recognizing that the jury was "free to choose among all reasonable constructions of the evidence." *United States v. Sneed*, 63 F.3d 381, 385 (5th Cir. 1995) (quoting *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991); *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992)).

In making his arguments, W. Reed again focuses primarily on the evidence most favorable to him. However the jury heard this evidence at trial, along with other evidence the Government introduced that was less favorable to W. Reed's case. *See* Tr. Ex. 47.13, 47.14, 47.15, 47.16, 76. Some of that evidence included various resolutions and contracts passed by the Hospital board that indicated the Hospital was retaining the District Attorney in his official

capacity. The Government also showed that W. Reed knew about these resolutions. Additionally,

W. Reed knew that any resolution drafted to retain him in his personal capacity had to be

reviewed, discussed, voted on, and passed by the Hospital Board. He also knew that none of this

had occurred. Further, W. Reed would sometimes attend board meetings himself, but other times

would send his subordinates in his stead. His subordinates were not compensated for this work

outside of their salaries as Assistant District Attorneys (ADAs), and they understood themselves

to be representatives of the Office of the District Attorney during those meetings.

It is the jury's unique role to determine the credibility of witnesses and weigh the

sufficiency of the evidence, and the Court must accept those decisions and view the evidence in

the light most favorable to the verdict. After weighing the evidence, the jury clearly did not find

W. Reed credible, and found it was improper for him to keep the money designated for the

Office of the District Attorney. The Court cannot, post-trial, re-weigh the evidence and overturn

the verdict simply because another interpretation of the evidence is possible. The Court must

view the evidence in the light most favorable to the verdict, and, having done so, the Court finds

the jury's determination rational. The jury's determination on these counts must therefore be

upheld. Accordingly, W. Reed's Motion for Acquittal or Arrest of Judgment on this basis is

denied.

### 5.   Inappropriate merger of money laundering and wire fraud

#### (a)   W. Reed's Arguments

W. Reed argues that he merits an acquittal because money laundering charges cannot be

based on violations of state campaign finance law. (R. Doc. 261-1 at 32-33). Charges for money

laundering must be for an enumerated unlawful activities, and the misuse of campaign funds is

not one of those enumerated offenses. Further, because the alleged wire fraud was not completed

at the time of the alleged money laundering, the wire fraud and money laundering counts were

improperly merged. *United States v. Santos*, 553 U.S. 507 (2008); *United States v. Kennedy*, 707 F.3d 558 (5th Cir. 2013). Money laundering cannot rely on the "same or continuing conduct of the underlying predicate crime." *Kennedy*, 707 F.3d 558. A merger exists if the underlying conduct was not complete by the time of the alleged money laundering or if the money laundering transaction was a payment of gross receipts rather than profits of the underlying crime. *Id*. at 910. W. Reed argues that the payments made to S. Reed were not profits, but rather gross receipts of the wire fraud charges. W. Reed's act of sending money to S. Reed acts as *both* wire fraud and the money laundering, which is an improper merger of the two issues. W. Reed argues he should therefore be acquitted of money laundering (Count 9).

(b)     The Government's Arguments

The Government rejects W. Reed's argument that money laundering was inappropriately merged with wire fraud, highlighting that the Court considered and rejected both arguments before trial. (R. Doc. 337 at 25-31). These claims are essentially pleas for the Court to reconsider its prior rulings, and the Government urges the Court to find that the argument has not changed and neither should the outcome.

(c)     Analysis

W. Reed argues that he should not have been convicted of money laundering because a money laundering charge cannot be based on a violation of state campaign finance law. This Court has previously addressed this argument in its Order and Reasons denying Defendants' Motions to Dismiss on October 13, 2015. (R. Doc. 63 at 14-15). As this Court previously stated, the argument has not changed, and neither will the outcome. For the sake of completeness, the Court will reiterate its prior analysis and holding.

The money laundering statute provides in pertinent part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
>
> > (A)(i) with the intent to promote the carrying on of specified unlawful activity ... [shall be guilty of money laundering]

18 U.S.C. § 1956. To prove money laundering, the government must prove that (1) the financial transaction in question involves the proceeds of unlawful activity, (2) the defendant had knowledge that the property involved in the financial transaction represented proceeds of an unlawful activity, and (3) the financial transaction was conducted with the intent to promote the carrying on of a specified unlawful activity. *United States v. Wilson,* 249 F.3d 366, 377 (5th Cir.2001).

W. Reed argues that the money laundering counts must be dismissed because 18 U.S.C. §1956 does not list violations of state campaign law as a predicate offense. Notably, however, the predicate offense charged in the Indictment is wire fraud. Although wire fraud is not listed as a "specified unlawful activity" in the money laundering statute, "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1)." 18 U.S.C. §1956(c)(7)(A). And, significantly, section 1961 does specifically include wire fraud. Thus, the alleged wire fraud represents the unlawful activity as required by the money laundering statute. *See United States v. Brown*, 186 F.3d 661, 667 n.10 (5th Cir. 1999) ("[T]he money laundering statute defines 'specified unlawful activity' to include mail and wire fraud."); *see also United States v. Valuck*, 286 F.3d 221, 225 (5th Cir. 2002) (finding that first element of the offense of money laundering was established where the defendant did not appeal the sufficiency of the government's evidence charging him with wire fraud). Thus, the allegation that Defendants engaged in financial transactions using the ill-gotten donations obtained from their fraudulent

misrepresentations to further defraud donors is sufficient to allege money laundering. W. Reed's Motion for Acquittal or Arrest of Judgment on this basis is denied.

### 6.      Motion for Arrest of Judgment is Untimely and Unwarranted

#### (a)      Government's Arguments

The Government argues that while W. Reed requested additional time to file Motions under F. R. Cr. P. 29 and 33, he did not request additional time to file under Rule 34. (R. Doc. 337 at 41-42). Because F. R. Cr. P. 34 states that relief must be sought within fourteen days of the verdict, W. Reed's Rule 34 Motion filed twenty-nine days after the verdict was untimely. Further, the Government argues that W. Reed's arguments rely on previously-rejected theories and upon evidentiary proof at trial. No new evidence or other legal analysis was given to support a finding of error on the "face of the record," and thus no justification for granting an Arrest of Judgment.

#### (b)      Analysis

While there is an issue of timeliness as to relief under Rule 34, because the Court is not granting Defendant the relief he seeks under Rule 34, the issue of timeliness is moot. However, as is further discussed throughout this opinion, W. Reed presented no new evidence or other legal analysis to support a finding of error on the face of the record. Therefore, relief under Rule 34 is unwarranted.

### 7.      Exclusion of Critical Evidence

#### (a)      W. Reed's Arguments

In his Motion for a New Trial, W. Reed reiterates his arguments that the Court improperly limited witness testimony at trial and, in so doing, prevented him from putting on a full defense.

45

W. Reed argues that the Court unfairly limited Gray Sexton's testimony despite allowing Government witness Kathleen Allen to testify about the CFDA and the propriety of certain expenditures under state campaign finance law.  (R. Doc. 263-1 at 2-8). W. Reed believes that because Ms. Allen was permitted to testify and present evidence about interpretations of certain laws, Mr. Sexton should have been permitted to do the same. Because this evidence was kept from the jury, they did not know the traditional interpretation of the campaign law, and they were without crucial evidence that showed W. Reed's lack of specific intent to defraud. This prevented the jury from hearing a viable defense. W. Reed avers that he believed his expenditures were legal, and Mr. Sexton could have testified in support of that argument. Because Mr. Sexton was not permitted to testify, W. Reed argues he was prevented from putting on a full defense.

Mr. Sexton also could have testified about "dual purpose expenditures," which support W. Reed's defense, specifically that the expenditures regarding church donations, the Open House event, and birthday dinners were appropriate. W. Reed also sought to use Mr. Sexton to introduce and explain certain Board of Ethics advisory opinions that support his defense. W. Reed cites advisory opinions factually similar to his own that he avers would have helped his defense had his witness been permitted to testify about them. Finally, W. Reed argues that Mr. Sexton should have been permitted to testify about the Board of Ethics' procedure for handling improper campaign expenditures. Because Mr. Sexton's testimony was limited, W. Reed avers he was unable to put forth a full defense as was his right under the Sixth Amendment, resulting in reversible error deserving of a new trial.

W. Reed also alleges that the Court improperly excluded evidence regarding statements made by Paul Cordes, the former chairman of the Hospital, specifically the testimonies of Shawn

and W. Reed. (R. Doc. 263 at 12-17). W. Reed says Mr. Cordes informed him that he would be representing the Hospital in his personal capacity. However, Mr. Cordes passed away in 2004 and is accordingly unable to personally verify that statement. Testimony about that conversation, he argues, is not hearsay because it was not offered for the truth of the matter, but rather to show W. Reed's understanding and intent. Even if it were hearsay, W. Reed argues the statement falls under F.R.E. 807 as an exception to hearsay. W. Reed avers that sufficient testimony and corroborating evidence, including a type-written note suggesting W. Reed would represent the hospital in his personal capacity, permits the statements to fall under Rule 807. Accordingly, W. Reed argues he merits a new trial.

(b)     <u>The Government's Arguments</u>

The Government argues that allowing Mr. Sexton to testify on additional topics of state law would have been improper. (R. Doc. 337 at 42-47). First, Mr. Sexton's opinions on state law have no bearing on W. Reed's state of mind. Further, the Government argues that permitting Mr. Sexton to opine on the legality of dual-purpose expenditures would only be relevant if W. Reed had knowledge of their legality when he spent the campaign funds. W. Reed did not provide evidence of contemporaneous knowledge, nor did he aver that Mr. Sexton advised him of the legality of either generally-accepted or his specific campaign expenditures. Further, the Government argues that W. Reed made purchases for purely personal reasons; it does not argue that the purchases he made were per se illegal, but rather that the *personal purpose* for which W. Reed made the purchases was illegal. Additionally, W. Reed took the stand and testified that he believed his expenditures, particularly dual purpose expenditures, were legal under state law. W. Reed was the best witness to testify about his own intent, and he did. Accordingly, additional testimony by Mr. Sexton would have been improper.

47

The Government further argues that the Court properly excluded Mr. Sexton's legal conclusions because they are prohibited, irrelevant and would serve to confuse the jury. W. Reed sought to have Mr. Sexton give opinion testimony about state laws not charged in the indictment. Finally, the Government argues that Mr. Sexton's testimony was sufficient to counter Ms. Allen's testimony, pointing out that W. Reed does not identify any instances in which Mr. Sexton was prevented from addressing an issue raised by Ms. Allen's testimony.

The Government reiterates the Court's prior determination that the statements made by Paul Cordes are inadmissible hearsay under Fed. R. Evid. 801-807. While W. Reed argues that the statements made would not be introduced for the truth of the matter asserted but rather to demonstrate state of mind and are therefore not inadmissible hearsay, the Government disagrees, contending that W. Reed seeks to do more than merely prove the conversation took place, but rather introduce the substance of that conversation. The Court instructed W. Reed at trial that he could testify that a conversation occurred and that after the conversation, he took certain actions. The Government contends that W. Reed was not satisfied with this instruction and again seeks to introduce the substance of his conversation with Cordes. This would be hearsay.

Further, the Government avers that Cordes' statements do not fall under any hearsay exception. The Court already ruled that Cordes' statements do not fall under an exception for unavailable declarants. W. Reed argues that Rule 807 should apply in this case, but 807 is used in rare circumstances where there exists sufficient indicia of reliability. The Government argues that this is not the case here. The statements W. Reed seeks to admit are wholly self-serving and are only corroborated by a one-sentence 'memo,' the testimony of W. Reed and his ex-wife Shawn Reed, and a fax W. Reed himself wrote that was never passed or voted on by the Board. Further evidence was introduced showing the Board had voted on resolutions recognizing the

entire Office of the D.A. as its legal counsel, which further calls into question the reliability of Cordes' statements and cuts against an 807 exception.

Shawn Reed did testify at trial as to W. Reed's excluded conversation with Cordes. The Government argues that even though the Court had previously ruled that testimony was hearsay, it was introduced, and the Jury considered it. Even with Shawn Reed's testimony, the jury found W. Reed guilty of the hospital counts.

(c)     Analysis

Before trial, this Court denied W. Reed's motion *in limine* to include Gray Sexton's testimony, in part because his opinions were irrelevant to prove W. Reed's state of mind. (R. Doc. 159 at 10). While the Court may "weigh the evidence and may assess the credibility of the witnesses during its consideration," it has done so and finds no reason to overturn its prior rulings. *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008) (quoting *United States v. Robertson¸* 110 F.3d 1113, 1116 (5th Cir. 1997)). The Court will not relitigate this issue, but includes its prior reasoning and findings for the sake of completeness.

The proponent of expert testimony bears the burden of establishing its admissibility, *see Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir. 1998), and a district court has wide latitude and broad discretion to exclude expert evidence, *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997). Courts consider several factors when assessing whether to admit testimony from a witness who has been qualified as an expert. Federal Rule of Evidence 702 provides that an expert witness may testify if the expert's specialized knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As with all evidence, expert testimony must be relevant under Federal Rule of Evidence 401 and must satisfy a balancing test under Federal Rule of Evidence 403. *See United States v. Posado*, 57 F.3d 428,

435 (5th Cir. 1995). Even if the expert testimony is relevant, a court may exclude it under Rule 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Here, W. Reed has not met his burden of establishing the admissibility of Mr. Sexton's expert testimony or other "custom and practice" evidence. At the core of the W. Reed's motion is his argument that the expert testimony of Mr. Sexton is crucial to establishing Defendant's state of mind i.e., his lack of criminal intent. However, Mr. Sexton's opinions regarding the CFDA are not relevant to the W. Reed's state of mind. There is no evidence that W. Reed ever spoke to Mr. Sexton about the expenditures in question. Mr. Sexton does not and cannot speak to W. Reed's understanding of the rules. Any purported lack of clarity regarding the CDFA is only relevant to the extent that the W. Reed himself was actually confused. *See United States v. Whittemore*, 944 F. Supp. 2d 1003, 1011-12 (D. Nev. 2013) *aff'd*, 776 F.3d 1074 (9th Cir. 2015) (denying defendant's motion *in limine* to admit expert testimony regarding ambiguity of campaign finance regulations because "the defendant does not allege that he relied on [the expert's] expertise in interpreting the regulation and [the expert] does not offer testimony relating to [defendant's own ability to understand the legal principles involved.").

In *United States v. Herzog*, the defendant wanted to offer an attorney-expert's opinion "that tax laws are complex and that even law students, law professors, and attorneys find the subject very difficult." 632 F.2d 469, 473 (5th Cir. 1980). The trial court excluded this testimony, because "[n]one of the questions concerning [the expert's] view of tax laws could be relevant to the willfulness issue…since [the expert's] opinion that the laws are complex could not shed any light on whether Herzog had been confused by any such complexity at the time he

submitted the withholding forms." *Id.* The trial court further reasoned that other individuals'

"comprehension of the tax laws could not have any bearing on Herzog's intent." *Id.* Mr. Sexton,

like the expert in *Herzog*, does not provide any information about W. Reed's understanding of

the CFDA, so his testimony is not relevant to W. Reed's intent. *See Herzog*, 632 F.2d at 472;

*United States v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999) (upholding exclusion of expert

testimony that, because tax laws were complex, defendants beliefs about reporting gambling

wins were "reasonable" on the grounds that experts could not explain defendant's actual beliefs

or ability to understand legal principles); *Whittemore*, 944 F. Supp. 2d at 1012 (excluding expert

testimony regarding purported ambiguity in campaign finance regulation, reasoning that it would

be confusing because "only defendant's subjective belief is at issue." Mr. Sexton's opinions as to

the construction, usage and application of the CFDA based on interpretation of the law by the

Louisiana Board of Ethics do not speak to the issue of whether *W. Reed* believed his

expenditures were reasonable under the law. Indeed, W. Reed may not have ever read or even

been aware of the Board of Ethic's actions in interpreting and applying the law. W. Reed did

testify regarding his understanding of the prohibitions on his campaign expenditures under the

CFDA, but Mr. Sexton's testimony does not provide insight on W. Reed's subjective

understanding of the law. Consequently, Mr. Sexton's testimony would not "help the trier of fact

to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702.

The present circumstances are unlike the circumstances in *Simson* wherein an expert on

standard practices in the surety business was critical to develop the defense that it was the

standard practice in the surety business not to disclose indemnitors on bondability letters. *United*

*States v. Simson*, No. 90-7368, 1991 U.S. App. LEXIS 17217 (4th Cir. Aug. 1, 1991) Here,

although jurors may not be aware of the nuances of the CFDA, a detailed understanding of the

CFDA is not relevant and would not "help [the jurors] to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702. Defendant is not being charged with violating the CFDA. The gravamen of the charges against the Defendant are that he used campaign funds for personal use. A lay person (and presumably a potential campaign contributor) can appreciate that certain expenditures are unrelated to the holding of public office when they are purely personal expenditures. The concept of personal versus professional (unlike bondability letters in the surety business) is one that is well within the grasp of a reasonable juror.

The issue at present is also distinct from the facts in *Garber*. In *Garber*, the court held that the "combined effect of the trial court's evidentiary rulings excluding defendant's proffered expert testimony *and its requested jury charge* [that a misunderstanding as to defendant's liability for the tax is a valid defense] prejudicially deprived the defendant of a valid theory of her defense…. The Court erred by refusing to instruct the jury that a reasonable misconception of the tax law on her part would negate the necessary intent." 607 F.2d at 97, 99. Here, no one prevented W. Reed from arguing that he lacked the necessary intent to commit fraud because he believed that his campaign expenditures were related to the holding of public office and permissible under the CFDA. Moreover, the jury was instructed as to *mens rea.*

Additionally, Defendant seeks to introduce evidence that other candidates have reported expenditures for flowers and have donated money to faith-based organizations and educations. However, like the expert testimony, this evidence about the campaign expenditures of other candidates is also irrelevant. The Government is not arguing that spending money on flowers or donating money to churches or schools is *per se* illegal. Rather, for example, when the Defendant gave money to the Faith Tabernacle Church and its pastor, Reverend Jerry Cox, the Government argues this was not a donation. On the contrary, the Indictment alleges that this sum was

provided as a kickback in exchange for referring private legal work. It is of no consequence that other candidates under other circumstances properly (or improperly) gave money to churches. Similarly, the Government seeks to prove that W. Reed's expenditures were fraudulent when he purchased flowers for various individuals and made payments to Saint Paul's School for purely personal reasons. Evidence that others purchased flowers and donated money to schools is not relevant to whether W. Reed did the same for reasons unrelated to his campaign. Accordingly, excluding such evidence was not improper.

Additionally, Mr. Sexton's proffered testimony regarding that such expenditures are permissible under certain circumstances does not speak to W. Reed's intent in making such expenditures. Although the members of the jury may not have any knowledge or experience relating to campaign finance, a lay person can understand—without expert testimony—when an expenditure is personal and when it is not. Purchasing flowers for a constituent's funeral or in recognition of prior political support is different than purchasing flowers for your girlfriend, or for a person you met online and who resides in Caddo Parish, or for your own daughter, or to thank someone for a personal favor. Lay people can understand this distinction without expert testimony. Finally, evidence of legitimate purchases by others would shed no light on whether the Defendant in this case used his campaign funds for purely personal expenses or kickbacks.

At trial, the Government's fact witness, Kathleen Allen, testified about technical requirements and regulations and regarding W. Reed's campaign finance reports. After listening to Ms. Allen's testimony, the Court found she had opened the door to some rebuttal testimony and permitted Mr. Sexton to testify on various topics. However, the Court limited Mr. Sexton's testimony to the topics covered by Ms. Allen. For the reasons more fully developed above, the Court finds that limitation proper.

W. Reed avers he was unable to put on a full defense given Mr. Sexton's limitation. However, the Court finds that the excluded testimony W. Reed now seeks to include would have been inappropriate and irrelevant. As discussed above, W. Reed provided no evidence that he consulted with Mr. Sexton during the conspiracy. Accordingly, Mr. Sexton's personal opinion testimony regarding the legality of certain campaign expenditures has no bearing on W. Reed's *mens rea*. Mr. Sexton has no basis to testify as to W. Reed's beliefs either now or at the time he made the purchases. W. Reed is the most appropriate witness to testify to his own *mens rea*; and he did so. Further, because the Government did not allege that the purchases W. Reed made were *per se* illegal, Mr. Sexton's testimony that such purchases *could* be legal is not relevant to W. Reed's guilt. That fact was not contested.

W. Reed also argues that the Court inappropriately limited Shawn Reed's testimony and excluded a type-written note by W. Reed suggesting that Paul Cordes, former chairman of the board of the Hospital, told W. Reed that he would be representing the Hospital in his personal capacity. At trial, the Court rejected W. Reed's attempts to introduce this evidence, finding no basis for an 807 exception. (R. Doc. 311 at 187-191). The Court similarly finds no reason to overturn that holding now. Accordingly, W. Reed's Motion for a New Trial based on the exclusion of critical evidence is denied.

### 8.     Introduction of Improper Evidence

#### (a)     W. Reed's Arguments

W. Reed argues that the introduction of certain statements made by S. Reed violated his constitutional rights and he therefore deserves a new trial. (R. Doc. 263-1 at 8-12). At trial, the Government introduced statements made by S. Reed indicating that S. Reed did *not* provide liquor for the America Event despite being paid by W. Reed for doing so. Instead of introducing S. Reed as a witness, the Government introduced records of a conversation between S. Reed and

Heather Nolan, a reporter for nola.com. W. Reed argues that the introduction of this conversation violated the Confrontation Clause and *Bruton* because the statements were directly and facially incriminating and because W. Reed had no opportunity to confront the evidence since it was not introduced as a live witness. Additionally, S. Reed is a non-testifying co-defendant, so W. Reed was unable to call him to cross examine him on the statements. This, W. Reed argues, is specifically prohibited under *Bruton*.

W. Reed also argues that the manner in which the conversation was introduced was improper. The Government verified the evidence through an FBI financial analyst who did not participate in the conversation, speak to either party, or assist in preparing the records and therefore had no personal knowledge of the conversation or its authenticity. The Government should have introduced Ms. Nolan to avoid a clash with the Confrontation Clause. If the introduction of this statement stands, W. Reed avers that it will have serious policy implications. In theory, he argues, the Government could simply call one government analyst who has reviewed all the evidence, and submit the evidence through that witness.

Furthermore, W. Reed argues the conversation was hearsay. Though the Court instructed the jury to only pay attention to S. Reed's statements, the jury had already heard both sides of the conversation and was sent to deliberation with a full copy of the conversation.

Finally, W. Reed argues that the evidence was improperly admitted because it was fruit of the poisonous tree. This evidence was material obtained through hacking by a former romantic partner of W. Reed. W. Reed filed motions for an evidentiary hearing and for suppression, which were both denied. W. Reed argues that the evidence was illegally obtained and should not have been admitted.

(b)       The Government's Arguments

The Government highlights that the Court already considered and rejected W. Reed's argument that the Court should not have admitted the comments S. Reed made on Facebook. (R. Doc. 337 at 47-49). The Government again avers that the Facebook statements do not fall within the narrow *Bruton* and *Crawford* exceptions because they were not facially inculpatory and testimonial. Whether S. Reed provided alcohol was only inculpatory when connected with other evidence at trial, and therefore not facially inculpatory. Further, the statements were not testimonial because they were made to a reporter, on a social media platform, and not in connection with any investigation.

The Government also rejects W. Reed's assertion that admitting the conversation through an FBI Financial Analyst was problematic. Additionally, the parties had previously stipulated to the correspondence's authenticity. Further, the Government avers there were methods other than "cross examin[ing] a piece of paper" through which W. Reed could contend with S. Reed's statements, such as calling other witnesses or questioning the FBI analyst's knowledge of the conversation, but they did not do so. Finally, the Government contests W. Reed's argument that the conversation constituted inadmissible hearsay because of the parties' prior stipulation and because it was not admitted for the truth of the matter asserted. Ms. Nolan's comments were admitted for background on S. Reed's comments, which W. Reed does not contend were hearsay. Finally, the Government avers that the Court gave the jury a limiting instruction, which sufficiently addressed W. Reed's concerns.

(c)       Analysis

The Court has previously addressed W. Reed's concern about admitting the Facebook conversation that took place between S. Reed and a reporter, Heather Nolan, and finds no basis

to change its prior ruling. (R. Doc. 156; R Doc. 306). Further, the parties had previously stipulated to the authenticity of the conversation, and the Court provided a limiting instruction to the jury which sufficiently addressed W. Reed's concerns about hearsay. (R. Docs. 235 at 4, 11 and 306 at 64) While the Court declines to relitigate this previously-decided issue, for the sake of completeness, the Court will reiterate its holding.

## *THE SIXTH AMENDMENT AND CRAWFORD V. WASHINGTON*

The Sixth Amendment guarantees that a criminal defendant will be afforded the opportunity to confront the witnesses against him. "[T]he right of cross-examination is included in the right of an accused in a criminal trial to confront the witnesses against him." *Pointer v. State of Texas*, 380 U.S. 400, 404, 406-407 (1968) (noting that "a major reason underlying the constitutional confrontation rule is to give a defendant charged with a crime an opportunity to cross-examine the witnesses against him"). Pursuant to *Crawford v. Washington*, the Confrontation Clause of the Sixth Amendment bars the admission of "testimonial" out-of-court statements by a non-testifying witness unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the declarant-witness. 541 U.S. 36, 53-54 (2004).

For a statement to be "testimonial" under Crawford, it must have been made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009). Courts have regularly interpreted the word "trial" to mean a subsequent criminal prosecution, and the relevant point of view is of the declarant at the time he makes the statement. See, e.g., *United States v. Smalls*, 605 F.3d 765, 777 (10th Cir. 2010) (recognizing that a statement is testimonial "if a reasonable person in the position of declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime"). The

*Crawford* court provided a non-exhaustive list of testimonial statements that focused on statements made in court-like proceedings or to law enforcement, including affidavits, custodial examinations, depositions, prior testimony, and confessions. *See Crawford*, 541 U.S. at 51-52.

To determine whether a statement is "testimonial" under *Crawford*, the Fifth Circuit focuses on the "primary purpose of the interrogation." *United States v. Polidore*, 690 F.3d 705, 711 (5th Cir. 2012) (recognizing that "when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony, it does not fall within the scope of the Clause, and the admissibility of the statement is the concern of state and federal rules of evidence, not the Confrontation Clause") (internal quotations omitted). *Crawford* does not apply to statements "procured for the primary purpose of allowing police to assist in an ongoing emergency or … under other circumstances where the primary purpose is not to create an out-of-court substitute for trial testimony." *Brown v. Epps*, 686 F.3d 281, 287 (5th Cir. 2012).

Since *Crawford*, the Fifth Circuit and the Supreme Court have held that statement to 911 operators, *Polidore*, 690 F.3d 705, government informants (when the co-conspirator making the statement is unaware that the person to whom they were speaking was a government agent or informant), *Brown*, 686 F.3d 281, and jail cellmates, *United States v. Vasquez*, 766 F.3d 373, 378-79 (5th Cir. 2014) (collecting cases), are non-testimonial and, hence, admissible at trial against co-conspirator defendants.

S. Reed's statements are non-testimonial because of the circumstances in which he provided them and the nature of the individual to whom he provided them. S. Reed made the statement to a member of the news media via private social media. The "primary purpose" (and, likely, the only purpose) of Ms. Nolan's inquiry was to research and, ultimately, to publish, an accurate news story, not to create an out-of-court substitute for trial. W. Reed does not cite to any

case law suggesting that a court has been willing to enlarge the reach of *Crawford* to include

extra-judicial events such as news articles, "media frenz[ies]," "media trial[s]," the "court of

public opinion," and speculation regarding possible administrative action. Thus, to accept

Defendant's argument that S. Reed's statements were testimonial because they "occurred in the

context of a media frenzy" or "could be used against him in the court of public opinion" would

represent an impermissible expansion of *Crawford*. The proceedings at issue pursuant to

*Crawford* have been formal, court-based, and criminal.

     At the time the statements were made, S. Reed could not objectively foresee that a

statement he made to the news media via Facebook's private messaging feature might be used in

the investigation and prosecution of the crime since he could not have known that a covert

investigation was being conducted. *See Melendez-Diaz*, 557 U.S. at 310; *Smalls*, 605 F.3d at 777.

Therefore, the statements cannot be deemed testimonial under Crawford.

### *THE SIXTH AMENDMENT AND BRUTON V. UNITED STATES*

     In certain circumstances, the Confrontation Clause of the Sixth Amendment bars the

admission of a statement in a criminal trial by a co-defendant. In *Bruton v. United States*, the

Supreme Court held that where a co-defendant's confession was admitted at a joint trial and the

co-defendant-declarant did not take the stand, the defendant was denied his constitutional right of

confrontation, even though the jury was instructed not to consider the confession by the co-

defendant as evidence against the defendant. 391 U.S. 123, 127 (1968).

     *Bruton* involved two defendants accused of participating in the same crime and tried

jointly before the same jury. One of the defendants had confessed. His confession named and

incriminated the other defendant. The trial judge issued a limiting instruction, telling the jury that

it should consider the confession as evidence only against the codefendant who had confessed

59

and not against the defendant named in the confession. The Supreme Court held that, despite the limiting instruction, the Constitution forbids the use of such a confession in the joint trial. *Id.*

*Bruton* recognized that in many circumstances a limiting instruction will adequately protect one defendant from the prejudicial effects of the introduction at a joint trial of evidence intended for use only against a different defendant. *Id.* at 135. But it said that "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id*. Accordingly, the Supreme Court held that the co-defendant's confession—which stated that both he and the defendant together committed the crime—was such a "powerfully incriminating extrajudicial statemen[t]," that its introduction into evidence, insulated from cross-examination, violated Bruton's Sixth Amendment rights. *Id.* at 135.

Nonetheless, subsequent precedent has recognized the limited applicability of *Bruton*. *See, e.g., Richardson v. Marsh*, 481 U.S. 200 (1987). The Supreme Court and the Fifth Circuit have held that *Bruton* "applies only to statement that are facially inculpatory." *United States v. Stevens*, 778 F. Supp. 2d 683, 690 (W.D. La. 2011) (citing *Richardson*, 481 U.S. at 202-03); *see also United States v. Surtain*, 519 F. App'x 266, 288 (5th Cir. 2013) ("[W]e have consistently held that *Bruton* is not violated unless a co-defendant's statement directly alludes to the complaining defendant.") (internal quotations omitted). "Confessions that are only 'incriminating by connection' to other evidence are not excluded under *Bruton*." *Stevens*, 778 F.Supp. 2d at 690 (quoting *Richardson*, 481 U.S. at 209). In other words,

> Out-of-court statements of a non-testifying witness that only inferentially incriminate a defendant when linked to other evidence introduced at trial do not violate the Sixth Amendment because an instruction not to consider such a statement will be considered effective to remove it from the jury's consideration. But, statements that obviously incriminate a defendant, involve an inference that a

> jury could make immediately without hearing other evidence, and
> that a judge could easily predict prior to trial, before hearing any
> evidence, would be barred under the rational of *Bruton*, do violate
> the Confrontation clause.

*United States v. Harper*, 527 F.3d 396, 403 (5th Cir. 2008).

S. Reed is a co-defendant. *Bruton* specifically prohibits the admission of facially inculpatory statements of a non-testifying co-defendant as it denies the non-declarant defendant the opportunity to confront the witnesses against him. *See Stevens*, 778 F.Supp. 2d at 690. Thus, the question before the Court is whether S. Reed's statements to Ms. Nolan that he did not provide alcohol at the America Event only "inferentially incriminate [W. Reed] when linked to other evidence introduced at trial" *or* whether they "obviously incriminate [W. Reed]" because they "involve an inference that a jury could make immediately without hearing other evidence." *Harper*, 527 F.3d at 403 (5th Cir. 2008).

In deciding whether *Bruton*'s protective rule applies to S. Reed's statements to Ms. Nolan, three cases are instructive: (1) *Richardson v. Marsh*, which limited *Bruton*'s scope; (2) *Gray v. Maryland*, which the Supreme Court distinguished from *Richardson*; and (3) *United States v. Harper*, which the Defendant relied upon in his brief. The Court briefly summarizes each of these three cases.

In *Richardson v. Marsh,* the Supreme Court considered a redacted confession. 481 U.S. 200 (1987). The case involved the joint murder trial of Marsh and Williams. The State had redacted the confession of one defendant, Williams, so as to "omit all reference" to his codefendant, Marsh—"indeed, to omit all indication that *anyone* other than ... Williams" and a third person had "participated in the crime." *Id.* at 203 (emphasis in original). The trial court also instructed the jury not to consider the confession against Marsh. *Id.* at 205. As redacted, the confession indicated that Williams and the third person had discussed the murder in the front seat

of a car while they traveled to the victim's house. *Id.* at 203–204, n. 1. The redacted confession contained no indication that Marsh—or any other person—was in the car. Later in the trial, however, Marsh testified that she was in the back seat of the car. *Id.* at 204. For that reason, in context, the confession still could have helped convince the jury that Marsh knew about the murder in advance and therefore had participated knowingly in the crime.

The Supreme Court held that this redacted confession fell outside *Bruton*'s scope and was admissible (with appropriate limiting instructions) at the joint trial. The Court distinguished the co-defendant's confession in *Bruton* as a confession that was "incriminating on its face," and which had "expressly implicat[ed]" Bruton. 481 U.S., at 208. By contrast, Williams' confession amounted to "evidence requiring linkage" in that it "became" incriminating in respect to Marsh "only when linked with evidence introduced later at trial," namely that she was in the back seat of the car. *Id.* The Supreme Court held "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.,* at 211.

In *Gray v. Maryland,* a confession had been redacted to substitute the defendant's name with a blank space or the word "deleted." 523 U.S. 185 (1998). The Supreme Court held that the redacted confession fell within the class of statements to which *Bruton*'s protections apply because, unlike the redacted confession in *Richardson*, the confession in *Gray* referred directly to the "existence" of the nonconfessing defendant. *Id.* at 192. The Supreme Court reasoned that a jury would likely react similarly to an unredacted confession (like the confession in *Bruton*) and a confession redacted with a blank space or the word "deleted," because the jury would realize that the blank space in an obviously redacted confession points directly to the defendant. *Id.* at

194. The Supreme Court recognized that the statements in *Gray*, like those in *Richardson*,

required the jury to make inferences; however, the Court found that the inferences at issue in

*Gray*, unlike those in *Richardson*, "involve statements that, despite redaction, obviously refer

directly to someone, often obviously the defendant, and which involve inferences that a jury

ordinarily could make immediately, even were the confession the very first item introduced at

trial." *Id.* at 196.

 In *United States v. Harper*, the Fifth Circuit held that the admission of officers' accounts

of non-testifying co-defendant's statements—that he sold crack, that the firearms and narcotics

inside the residence were his, and that he was unaware of the cocaine found in the microwave

and "it was probably his dinner"—did not violate the defendant's right of confrontation. 527

F.3d 396 (2008). The Fifth Circuit held that the co-defendant's statements were "well within the

category of statements identified in *Richardson* that do not violate the Sixth Amendment"

because they "did not directly or obviously implicate [the defendant] until other evidence, such

as the fact that [the defendant] lived in the same house as [the co-defendant], was introduced."

*Id.* at 406. The co-defendant's admission that he sold crack cocaine did not facially incriminate

the defendant nor did it refer to the existence of the defendant or anyone else. *Id.* The statement

that he was unaware of the cocaine found in the microwave and it was probably his dinner was a

closer question for the Fifth Circuit because "it did obliquely refer to the existence of someone

else since if [the defendant] was unaware the cocaine was in the microwave, either [the

defendant] forgot he had put it there or someone had done, and in the latter case, a likely

candidate would be [the defendant], who also lived in the house." *Id.* Nevertheless, the Fifth

Circuit held that the statement was more analogous to the category of confessions that

*Richardson* says do not constitute a Confrontation Clause violation than it was to the category of

redacted confessions more directly incriminating a defendant that *Gray* holds do violate the Confrontation Clause. *Id.* at 406-407.

Similarly, here, the statements made by S. Reed to Ms. Nolan are more analogous to the category of statements that *Richardson* held do not constitute a Confrontation Clause violation because they become incriminating "only when linked with evidence introduced later at trial." To begin, the statements by S. Reed *are not confessions* and therefore, on their face, indicate no wrong-doing on the part of either Defendant. Unlike the statements in *Bruton* (admitting to robbery), *Richardson* (discussing a murder), and *Gray* (referencing illegal narcotics), the statements at issue merely indicate that S. Reed did not provide alcohol at his father's campaign event, in contradiction with a statement made by a spokesman for his father. Contradictory statements regarding the sale of alcohol are not facially inculpatory. While Defendant W. Reed argues that the statements are inculpatory on their face because of the language of the Indictment, the Court notes that the Indictment is not evidence and the Court instructed the jury as to the same. (R. Doc. 241 at 3, 17).

For these statements to become inculpatory, the Government also had to prove that W. Reed knew that his son was not providing alcohol and, further, if he did know his son was not providing alcohol, that the figure of $12/person for 2,450 people, totaling in $29,400 was not commensurate with the "bar setups and other services" excluding alcohol that S. Reed did provide for the event. Indeed, for these statements to be incriminating, the Government would have to put forth evidence regarding the America Event, including conflicting statements and representations made by W. Reed and evidence demonstrating what exactly S. Reed and his company did provide for the event and the fair market value of those services.

Moreover, the statements at issue, while they may help to convince the jury that W. Reed overpaid his son are, like the statements in *Richardson* (despite the fact that it may have helped convince the jury that Marsh participated in the crime) not protected by *Bruton* because they require the jury to make inferences that they cannot make without other evidence. *See Richardson*, 481 U.S. at 203-204. The statements in the present matter are unlike those in *Gray*, which require inferences "that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Gray*, 523 U.S. at 196. If the statements S. Reed made to Ms. Nolan were the very first item introduced at trail, the jury would be completely unaware as to any incriminating effect that they might have on W. Reed. With respect to these statements—that S. Reed didn't provide alcohol at the America Event—the limiting instruction adequately protected W. Reed from the prejudicial effects of the introduction at a joint trial of evidence intended for use against S. Reed. (R. Doc. 306 at 64); *see also Bruton*, 391 U.S. at 135. The statements at issue are not so "powerfully incriminating" that, as contemplated in *Bruton*, the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.,* at 135. Accordingly, *Bruton* does not apply and the introduction of the statements at issue does not violate W. Reed's Reed Sixth Amendment right of confrontation.

Considering the foregoing, the Court finds that admission of the statements made by S. Reed to Ms. Nolan at trial do not violate W. Reed's Sixth Amendment right to confront the witnesses against him under either *Bruton v. United States* or *Crawford v. Washington*. Accordingly, his Motion for a New Trial on this ground is denied.

9.     Severance[10]

(a)     W. Reed's Arguments

W. Reed argues that he is entitled to a new trial because the Court failed to sever his counts pre-trial. (R. Doc. 263-1 at 17-22). W. Reed believes the charges related to campaign finance fraud should have been severed from the charges related to his representation of the Hospital because the two charges were distinct and did not overlap at trial. Additionally, there was no nexus between the two, given that the tax reporting in Count 11 was ultimately not related to the Hospital. Because the trial was not severed, W. Reed argues the campaign counts served as character assassination and created an impermissible and prejudicial spillover effect.

W. Reed also argues that his trial should have been severed from S. Reed's trial. Severance would have avoided the *Bruton* issue discussed above. Additionally, none of the Hospital or tax charges were related to S. Reed. Trying the two parties together created an additional impermissible and prejudicial spillover effect.

(b)     The Government's Arguments

The Government opposes both Defendants' contentions that the Court should have severed certain indictments and the two defendants. (R. Doc. 337 at 52-58). The Government argues that W. Reed fails to cite supporting case law, and simply reiterates previously-asserted arguments. The Government adopts the Court's pre-trial holding that the various counts on the indictment formed a common scheme with a singular purpose. Further, in arguing to sever the Defendants, both parties ignore existing precedent, the Court's limiting instruction, and the volume of incriminatory evidence presented against S. Reed. Severance is not warranted just

---

[10] S. Reed also argues that he merits a new trial because the court failed to sever his trial from W. Reed's. (R. Doc. 329-1 at 16-18). Because the arguments and results are substantially similar, the Court extends its findings and conclusions in this section to S. Reed's request for relief in his Motion, and will not reiterate the arguments and holdings in the section dedicated to S. Reed.

because it would increase a Defendant's chance of acquittal. The Government avers that S. Reed only suffered prejudice as a result of his own actions evidenced at trial, not as a result of the actions taken by his father, W. Reed.

(c)     Analysis

This Court has already addressed W. Reed's arguments that the cases and indictments should have been severed in a pretrial order, and W. Reed presents no compelling reason for the Court to overturn its prior holding. While the Court will not relitigate this issue, it incorporates prior reasoning and holdings for completeness.

*JOINDER*

When reviewing a motion to sever, the preliminary inquiry is whether joinder was proper as a matter of law under Rule 8 of the Federal Rules of Criminal Procedure. *See United States v. Holloway*, 1 F.3d 307, 310 (5th Cir. 1993). Where, as here, an indictment charges multiple defendants and multiple counts, Rule 8(b) governs the propriety of joinder. *See United States v. Kaufman*, 858 F.2d 994, 1003 (5th Cir. 1998). This rule allows joinder of defendants in the same indictment if they are alleged to have participated "in the same series of acts or transactions ... constituting an offense or offenses." Fed. R. Crim. P. 8(b). Whether the counts charged fulfill this "same series" requirement is determined by the facts in the indictment, which are accepted as true absent arguments of prosecutorial misconduct.[11]  *See United States v. McRae*, 702 F.3d 806, 820 (5th Cir. 2012); *United States v. Faulkner*, 17 F.3d 745, 758 (5th Cir. 1994). There is no requirement that each defendant have participated in the same act(s), or that each defendant be charged in the same count(s). Fed. R. Crim. P 8(b); *McRae*, 702 F.3d at 820.

---

[11] The Defendants have made no arguments regarding prosecutorial misconduct.

Rather, Rule 8 is "flexible" and broadly construed in favor of joinder. *United States v. Butler*, 429 F.3d 140, 146 (5th Cir. 2005); *see also United States v. Bullock*, 71 F.3d 171, 174 (5th Cir. 1995) ("Joinder of charges is the rule rather than the exception and Rule 8 is construed liberally in favor of initial joinder.") The dispositive inquiry is whether the indictment charges "a series of acts unified by some substantial identity of facts or participants." *See McRae*, 702 F.3d at 821 (quoting *United States v. Dennis*, 645 F.2d 517, 520 (5th Cir. 1981)); *see also United States v. Harrelson*, 754 F.2d 1153, 1176 (5th Cir. 1985) ("Whether the counts of an indictment fulfill the 'same series' requirement is determined by examining the relatedness of the facts underlying each offense.")).

W. Reed argues that campaign and tax counts are improperly joined with the Hospital counts.[12] W. Reed constructs his joinder analysis under Rule 8(a); however, Rule 8(b) provides the relevant standard. Nonetheless, because the two subsections overlap, the Court is able to evaluate W. Reed's arguments under the relevant standard. W. Reed argues that, other than the fact that the charges are levelled against the same individual, there is no logical connection between (1) the Hospital counts, which allege a scheme to deprive the St. Tammany District Attorney's Office of a salary for legal services and (2) the Campaign and related tax counts, which concern the misuse of campaign funds and allege a scheme to defraud campaign contributors of campaign donations. W. Reed characterizes these two sets of counts as two distinct schemes with different victims. The allegations in the two schemes involve funds originating from different sources that were deposited in distinct transactions. In the scheme to

---

[12] Defendant Steven Reed asserts that the Campaign counts, which include the charges against him, are improperly joined under Rule 8 with the tax and Hospital counts. However, he did not offer any support for this assertion. Moreover, this argument is without merit as the tax counts are closely related to the Campaign counts. The misuse of campaign funds constitute a portion of W. Reed's income that is the basis of the tax charges. Accordingly, the tax counts are properly joined with the Campaign counts under Rule 8.

defraud the Office of the District Attorney, the funds are payments made by the Hospital that were deposited into W. Reed's personal account. In the scheme to defraud campaign contributors, the funds are campaign donations that were improperly expended for personal use.

While the Court acknowledges the differences between the Hospital counts and the Campaign and tax counts, those differences are insufficient to overcome the liberal rule of joinder. *United States v. Bullock*, 71 F.3d 171, 174 (5th Cir. 1995) ("Joinder of charges is the rule rather than the exception and Rule 8 is construed liberally in favor of initial joinder."). The Campaign and tax counts are properly joined with the Hospital counts because they are part of a common series of transactions with a singular purpose—to exploit W. Reed's influence as district attorney for personal financial betterment. To enrich himself, Defendant W. Reed employed a singular means—fraud. In addition to the common means and ends, the conduct alleged in the Campaign counts and the Hospital counts occurred during the same time period and involved several of the same people (e.g., W. Reed's accountant and individuals with Office of the District Attorney). Thus, joinder of all charges in the Superseding Indictment is proper under Rule 8 because the facts and participants underlying all counts are substantially related.

## SEVERANCE

It is the general rule "that persons who are indicted together should be tried together." *U.S. v. Michel,* 588 F.2d 986, 1001 (5th Cir.1979). "Joint trials play a vital role in the criminal justice system." *Zafiro v. U.S.,* 506 U.S. 534, 537 (1993) (internal quotation omitted). However, Federal Rule of Criminal Procedure 14 provides that "if the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). The United States Supreme Court

has explained that "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539. The Fifth Circuit has explained that "[i]n ruling on a motion to sever, a trial court must balance potential prejudice to the defendant against the public interest in joint trials where the case against each defendant arises from the same general transaction." *U.S. v. Simmons,* 374 F.3d 313, 317 (5th Cir. 2004) (internal quotation omitted).

The Fifth Circuit has explained that "[a] defendant is not entitled to severance just because it would increase his chance of acquittal or because evidence is introduced that is admissible against certain defendants." *Burton v. U.S.,* 237 F.3d 490, 495 (5th Cir.2000) (citing *Zafiro,* 506 U.S. at 540). Furthermore, "even where defendants have markedly different degrees of culpability, severance is not always required if less drastic measures, such as limiting instructions will suffice to cure the prejudice." *Id.* (citing *United States v. Broussard,* 80 F.3d 1025, 1037 (5th Cir.1996)); *see also U.S. v. Bermea,* 30 F.3d 1539, 1572 (5th Cir.1994) ("Any prejudice created by a joint trial can generally be cured through careful jury instructions."). The Fifth Circuit has explained that "[i]f the jury can keep separate the evidence that is relevant to each defendant, even if the task is difficult, and render a fair and impartial verdict as to each defendant, a severance should not be granted." *U.S. v. Ramirez,* 145 F.3d 345, 355 (5th Cir.1998) (citing *United States v. Walters,* 87 F.3d 663, 670–71 (5th Cir.1996)).

Notwithstanding proper joinder under Rule 8, the Court may grant severance upon a proper showing of prejudice. S. Reed requests severance because of the potential spillover effect from evidence and allegations that do not pertain to him. He argues that the evidence that will be

presented against his father in the tax and Hospital counts, including evidence of his father's income, will create a prejudicial spillover effect that will preclude the jury from impartially assessing the evidence against him. However, neither the spillover effect nor the fact that the government might present more evidence against W. Reed than S. Reed justifies severance. *See U.S. v. Krout*, 66 F.3d at 1420, 1430 (5th Cir. 1995).

The law is clear that "[w]hile the district court must guard against undue prejudice, it need not protect conspirators from evidence of their confederates' acts in furtherance of their common illegal aims." *U.S. v. Manges*, 110 F.3d 1162 1174-75 (5th Cir. 1997). Accordingly, the prejudice alleged by S. Reed is not of the type Rule 14 was designed to protect against. *United States v. Jones*, 303 F.R.D. 279, 286 (E.D. La. 2014). And, even if it were, S. Reed has failed to demonstrate that any potential prejudice could not be cured with a limiting jury instruction. Finally, any potential prejudice that could not be cured by instructions to the jury is outweighed by the public interest in joint trials. *See U.S. v. Simmons,* 374 F.3d 313, 317 (5th Cir. 2004). Severance of the tax counts from the campaign counts would have required the Government to introduce the same evidence in two trials, resulting in inefficiency and unnecessary expenditure of judicial resources. It is clear which allegations relate to S. Reed, and the jury was able to sort out the evidence and view each Defendant separately with a curative jury instruction.

W. Reed argued that a trial including both the Campaign and Hospital counts prejudiced him because he may wish to testify in defense of some of the charges but not others, forcing him to choose between testifying as to both set of counts or testifying as to neither. He argued that his own testimony is critical to defending against the Hospital counts, whereas he has a strong interest in refraining from testifying on his own behalf with regards to the Campaign and tax counts.

In *United States v. Ballis*, the Fifth Circuit articulated the following two-part standard to address the type of prejudice claimed by W. Reed in the instant motion. "A defendant seeking severance of charges because he wishes to testify as to some counts but not as to others has the burden of demonstrating that he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other." 28 F.3d 1399, 1408 (5th Cir. 1994) (internal citations and quotations omitted).

The limited case law on severance motions related to a defendant's decision to testify does not greatly illuminate the question just how "important" must be the defendant's proffered testimony or what kind of "strong" reasons explain the need not to testify on other counts. *United States v. Alosa*, 14 F.3d 693, 695 (1st Cir. 1994). Nonetheless, the defendant's burden of demonstrating that he has both important testimony to give concerning one count and a strong need to refrain from testifying on another is a "heavy" burden and requires a showing of "real" prejudice. *United States v. Holland*, 10 F.3d 696, 699 (10th Cir. 1993).

W. Reed fails to meet this burden. While he puts forth a plausible argument that he has important testimony to give regarding the Hospital counts, it is not clear how important this testimony is to his defense. *See Alosa*, 14 F.3d at 695 (finding that while testimony defendant would have offered "might have been of some help to him," it was not a strong enough reason for severance). More significantly, W. Reed has not demonstrated that he has any need, much less a "strong need," to refrain from testifying in the Campaign counts. His argument is entirely speculative. It turns on whether the government intends to call a past romantic partner as a witness. Moreover, even if called to the stand, neither the Court nor W. Reed can predict what this witness will say or how the jury will react. It is possible that the jury will not find her credible. It is equally possible that her testimony on cross-examination will have the effect of

bolstering W. Reed's defense. There is no showing of real prejudice with respect to such a speculative argument.

Furthermore, W. Reed's concerns regarding the testimony of a witness can be and were resolved with a curative jury instruction. The jury was instructed to view each count separately. Finally, obvious considerations of judicial economy, which support trying all related counts against the same defendant at one time outweigh W. Reed's interest in having a free choice with respect to testifying. *See United States v. Jardan*, 552 F.2d 216, 220 (8th Cir. 1977); *United States v. Alosa*, 14 F.3d 693, 695 (1st Cir. 1994). While the courts zealously guard a defendant's Fifth Amendment right not to testify at all, the case law is less protective of a defendant's right to testify selectively, addressing some issues while withholding testimony on others that are related. *See Brown v. United States,* 356 U.S. 148, 155–56, 78 S.Ct. 622, 627 (1958).

For the foregoing reasons, the Court finds that the counts in the Indictment are united by common facts and participants, and that any potential prejudice inherent in a joint trial is insufficient to justify severance under Rule 14.

Accordingly, the Court denies Defendant's motion for a new trial on the above grounds

### 10.    Prosecutorial Misconduct

#### (a)    W. Reed's Arguments

Finally, W. Reed alleges that he is entitled to a new trial due to prosecutorial misconduct. (R. Doc. 263-1 at 24-30). One week prior to trial, certain information that had been excluded as evidence was disseminated by the government to media outlets. W. Reed's resulting motion for change of venue or continuance was denied. Additionally, the Court denied a request for a continuance, despite the fact that the Government repeatedly produced untimely *Brady* material. Finally, the Government repeatedly changed the tax charge, up to a month before trial. Because of the moving target, W. Reed argues he was unable to adequately prepare a defense for the tax

charges. The Court's failure to grant brief continuances for all of these incidents requires a new trial.

Further, W. Reed argues the Government participated in improper argument and witness examination. W. Reed argues the Government's opening statement was character assassination and blurred the line between campaign funds related to wire fraud, and public funds related to mail fraud. W. Reed alleges the Government's opening statement suggests all of the charges dealt with public funds. During witness examination, the Government asked about his son's scholarship and about his income outside of his role as District Attorney. None of those questions, W. Reed argues, were relevant or proper. Additionally, they asked questions about events that took place before the time frame at issue in this case and about events for which they presented no evidentiary support. These *ad hominem* attacks, W. Reed argues, only served to incite the jury. Finally, W. Reed argues the Government made improper statements during its closing argument. Specifically, the Government misrepresented evidence that was not in the record.

(b)      The Government's Arguments

The Government avers the Defendant's request for a continuance was unwarranted. *Id*. at 59-61). The Government argues that the unsealed filing of a motion to admit business records was proper after Defendants had refused to stipulate to their authenticity. Further, jurors were selected through *voir dire*, which accounted for exposure to media reports, and, accordingly, to the information in that motion. Exchange of further discovery the week before trial also did not warrant a continuance. Both parties provided evidence during that week, and the volume of material was a small percentage of the total discovery. Additionally, some of the discovery produced was due to parties' inability to locate or open certain documents that were sent or

believed to be sent earlier in the process. Finally, though the Government contends the evidence did not constitute *Jencks* material, it was all produced well in advance of the timeline required by the Jencks Act. 18 U.S.C. § 3500(a)-(b). The Court's denial of a continuance was proper.

<u>Request to Strike</u>

The Government argues that W. Reed's reiterated request to strike Paragraph 9 of Counts 15-19 in the Superseding Indictment is meritless and was properly denied before trial. *Id.* at 58-59. The Government avers there is no support for the argument that they attempted to mislead the court, and W. Reed does not explain how the evidence prejudiced him or caused the Jury to find him guilty on other charges. In his argument, W. Reed ignores the extensive evidence the Government produced at trial and merely alleges prejudice. This is not sufficient to overcome a verdict and merit a new trial.

<u>SugarDaddie.com</u>

W. Reed argues that the admission of evidence from SugarDaddie.com, including statements he made about the Thanksgiving Dinners he paid for with campaign funds, should have been excluded because they were 'fruit of the poisonous tree.' He argues the evidence was obtained through his ex-girlfriend's hacking that eventually led to a search warrant. The Government highlights that the Court, however, addressed these arguments pretrial and found no evidence that W. Reed's ex-girlfriend acted as government agent, and accordingly found suppression inappropriate because the Fourth Amendment was not implicated by this private search. The introduction of this evidence was limited – e.g. no reference was made to the name"SugarDaddie.com" – and W. Reed raises no arguments that were not addressed in previously-considered motions. (R. Doc. 61).

*Government Statements and Cross-Examination of W. Reed*

The Government contends that it did not err in its opening statements, closing statements, or cross-examination of W. Reed and, further, the Defendants did not make any of these objections during trial. (R. Doc. 337 at 62-65). The Government argues that W. Reed should have objected at trial, and his failure to do so makes the present arguments untimely. Further, he does not provide any legal justification for the arguments he now raises. W. Reed must show that the statements were improper and that they substantially affected his right to a fair trial. The Government avers that he failed to do so.

The purpose of opening statements is for each side to set the stage for the jury and to forecast what they intend to prove. The Government argues that in objecting to its opening statement, W. Reed does not point to any testimony the Government promised that they did not later deliver. Further, the Court reminded the jury that any statements or arguments made by the attorneys are not evidence. The Government also avers its cross-examination of W. Reed was proper, relevant, and supported by evidence it submitted or offered to submit on rebuttal. None of the statements or questions the Government presented at trial were unfairly prejudicial, nor did they implicate any substantial right or the fairness and integrity of the proceeding. Accordingly, a new trial is not warranted

(c)     Analysis

W. Reed raises objections to certain questions and statements made by the Government during the trial, and argues that such prosecutorial misconduct warrants him a new trial. These objections should have been raised during the trial. *United States v. Torres-Colon*, 790 F.3d 26, 33 n.4 (1st Cir. 2015). W. Reed's failure to timely object at trial prevented the Court from considering the objection and taking corrective action, if appropriate. See, e.g., *Thomas v.*

*Moore*, 866 F.2d 803 (5th Cir.) (reversed on other grounds) (failure to timely object to the jury selection process voids relief). Permitting W. Reed to raise these objections now could encourage defendants to forego objecting during trial in the hopes that the Court would later grant a new trial.

Further, W. Reed fails to legally support his arguments that the Government's questions and statements substantially affected his right to a fair trial. *United States v. Diaz-Carreon*, 915 F.2d 951, 956 (5th Cir. 1990). Under Fifth Circuit precedent, the Court cannot grant a new trial on bare allegations that W. Reed was prejudiced. W. Reed does not provide sufficient proof, especially in the light of the evidence presented at trial, that the Government's opening statements, closing arguments, or questions on cross-examination were unfairly prejudicial, affected any substantial right, or seriously affected the fairness, integrity, or public reputation of the proceeding. *United States v. Gaudin*, 515 U.S. 506, 527 (1995). Even if the prosecution's comments were inappropriate, that would not, on its own, be enough to grant acquittal or a new trial. *See United States v. Young*, 470 U.S. 1, 11, 105 S. Ct. 1038, 1044 (1985) ("Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding."). Further, this Court previously found no evidence indicating that Reed's former romantic partner acted as a Government agent and concluded that under existing precedent, suppression was inappropriate because the Fourth Amendment does not apply to private searches. *See* Doc. No. 206 at 4 (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984), *United States v. Grimes*, 244 F.3d 375, 383 (5th Cir. 2001)). No new arguments supporting suppression based on 'fruit of the poisonous tree' have since been raised.

Accordingly, W. Reed's motion for a new trial on this ground is denied.

**C.      S. Reed's Motion for Judgment of Acquittal, Arrest of Judgment, or New Trial**

S. Reed argues that he should be granted a new trial because of (1) ineffective assistance of counsel; (2) federalism concerns; (3) failure to prove a conspiracy; (4) failure to prove count 9; (5) failure to sever; and (6) failure to prove paternity. (R. Doc. 329-1).

The Government avers that all of S. Reed's arguments are meritless, specifically that his counsel was ineffective and conflicted, that the Court's Pinkerton instruction was incorrect, that the Government failed to prove the elements of the conspiracy, that the Government failed to prove the elements of Count 9, and that the Government failed to prove that W. Reed was S. Reed's father.

### 1.      Ineffective Assistance of Counsel

#### (a)      S. Reed's Arguments

S. Reed alleges ineffective assistance of counsel because his attorney had divided loyalties. The Sixth Amendment guarantees representation that is free from conflict. *United States v. Garcia-Janso*, 472 F.3d 239, 243 (5th Cir. 2009). Conflicts include divided loyalties, which may be indicated by a co-defendant paying attorney's fees. *Id.*; *United States v. Jackson*, 805 F.3d 775, 801 (5th Cir. 2000); *Woods v. Georgia*, 450 U.S. 261, 268-69 (1981). A conflict can also be shown by demonstrating that a plausible defense could have been raised but was not because of the attorney's conflict of interest. *United States v. Burns*, F.3d 239, 856-57 (5th Cir. 2008).

S. Reed argues that his father, W. Reed, was the main focus of this case and that S. Reed was just a bargaining chip to convince W. Reed to plead. The Government's evidence overwhelmingly focused on W. Reed, and S. Reed's role in the conspiracy was to receive the improper campaign funds. (R. Doc. 329-1 at 1). The defense put on by S. Reed's trial attorney

was a joint defense; a collaboration between the two defense attorneys. Although a joint-defense is not *per se* ineffective, S. Reed argues that there was evidence and arguments helpful to his defense that were not raised because they could have hurt W. Reed's defense.

S. Reed highlights two instances in which defenses were not raised to counter incriminating evidence. The first piece of evidence was the $14,300 invoice that failed to detail all of the relevant jobs for which S. Reed was billing. S. Reed argues that his attorney failed to introduce evidence or testimony explaining the joint-invoice and it therefore appeared that the invoice was at least partially illegitimate. *Id.* at 2-3. The second piece of evidence was S. Reed's Facebook conversation with Heather Nolan, a reporter from nola.com. In that conversation, S. Reed denied providing alcohol for one his father's events when, in fact, he had. S. Reed now explains that his father told him to answer the reporter in this way, and that he was suffering from Corexit poisoning, which causes memory loss. *Id.* Although S. Reed informed his attorney of his defenses, they were not raised at trial. S. Reed claims he was 'told' he was not going to testify and would have to rely on his father's testimony. *Id.* at 3-4.

S. Reed further argues that certain exculpatory evidence was never introduced. He alleges that he deferred to his father on business and legal matters, and as a result did not question the legality of his father's actions. These three pieces of evidence and their defenses could have proven that S. Reed did not have the requisite intent or *mens rea*. S. Reed argues his attorney chose not to introduce them, however, because they would have negatively impacted W. Reed's case.

Additionally, W. Reed selected and paid S. Reed's lawyer, W. Glenn Burns, who had known W. Reed for many years and who had worked closely with W. Reed's attorney, Mr. Simmons. S. Reed claims his counsel assumed the role of Mr. Simmons' co-counsel.

S. Reed avers that the above warrants a new trial under *Cuyler v. Sullivan*, or, alternatively, *Strickland v. Washington*. 466 U.S. 335 (1980); 466 U.S. 668 (1984). The first prong of *Strickland*, S. Reed argues, is satisfied because multiple representation suffices to prove prejudice, and multiple representation exists in this case given Mr. Burns' personal and professional ties to W. Reed and Mr. Simmons, and given the joint defense agreement. *Perillo v. Johnson*, 205 F. 3d 775, 797-800 (5th Cir. 2000). While W. Reed was not officially Mr. Burns' client, S. Reed argues, the ties and joint-defense agreement essentially created that relationship. Secondly, S. Reed argues Mr. Burns did not present an independent defense and thus meets the second *Strickland* prong.

(b)   <u>Government's Arguments</u>

The Government opposes S. Reed's argument that his trial attorney had a conflict of interest given his relationship to W. Reed and W. Reed's attorney, characterizing it as an "undocumented and unsupported recreation of events at trial." (R. Doc. 337 at 66-70). While S. Reed analyzes his trial attorney's trial strategy and terms it unfavorable, he does not indicate under which rule of criminal procedure he seeks relief. To prove ineffective assistance of counsel in this case, S. Reed would have to prove an actual conflict of interest. *See*, *Cuyler v. Sullivan*, 446 U.S. 335, 345-350 (1980); *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). The conflict cannot be merely potential – the Defendant must prove his attorney made an actual choice between two options, and the option he chose was not in the Defendant's best interest. *See*, *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006). Then, the Defendant must prove the conflict adversely affected counsel's representation of Defendant.

The Government argues that S. Reed's allegations do not establish either a conflict or an adverse effect, as a third-party fee agreement is not an automatic conflict. In addition, the

80

Government avers that S. Reed could have raised the issue of the third-party fee agreement at or before trial, but he never did. Further, S. Reed does not provide any evidence of his contention that his attorney failed to pursue defenses that were helpful to him but would have hurt W. Reed. S. Reed does not fairly weigh the extent of the evidence against him, but simply asserts that his counsel's strategy was to blame for his conviction. The Government avers that S. Reed's claims are just bare allegations that are not supported by evidence, and therefore fail.

(c)     Analysis

S. Reed claims his attorney had divided loyalties and failed to raise certain defenses, rendering his counsel ineffective. In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both cause and prejudice:

> Under *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), a habeas petitioner claiming ineffective assistance of counsel has the burden to demonstrate both deficient performance and prejudice. As to the former, judicial scrutiny of counsel's conduct 'must be highly deferential . . . the distorting effect of hindsight' is to be avoided, and courts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." "It is not enough to show that some, or even most, defense lawyers would have handled the case differently." *Green v. Lynaugh*, 868 F.2d 176, 178 (5th Cir. 1989). To establish prejudice, "it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," rather, he must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Nichols v. Scott*, 69 F.3d 1255, 1284 (5th Cir. 1995) (further citation omitted). A court reviewing an ineffectiveness claim need not address both prongs of the Strickland standard, but may dispose of the claim based on defendant's failure to meet either prong of the test. See *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994). Furthermore, "the Constitution does not mandate error-free counsel." *Henry v. Wainwright*, 721 F.2d 990, 996 (5th Cir. 1983).

Review and study of the record shows no evidence that S. Reed's attorney provided incompetent or ineffective legal assistance during the pretrial or trial phases of this case. Further, while S. Reed makes bare allegations as to the ineffectiveness of his trial attorney's strategy at trial, he does not prove or attempt to prove any real prejudice. S. Reed fails to demonstrate a "reasonable probability" that he would have been found not guilty but for the actions of his trial attorney. To prove ineffective assistance of counsel in this case, S. Reed would have to prove an actual conflict of interest. *See*, *Cuyler v. Sullivan*, 446 U.S. 335, 345-350 (1980); *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). To obtain relief under *Strickland*, a petitioner must show both unreasonable performance by counsel and prejudice to the petitioner's case as a result of counsel's performance. While S. Reed alleges that certain evidence was not introduced in his defense because it would have hurt his father, he fails to prove any actual decision was made by his attorney with his father in mind. Though he submits an affidavit with his Motions, that affidavit merely puts forth another interpretation of the evidence submitted at trial. (R. Doc. 329-2). It does not prove any misconduct or conflict. Further, while S. Reed could have proven a conflict of interest had he shown that a "plausible alternative defense strategy that could have been pursued, but was not, because of" divided loyalties, he did not demonstrate that divided loyalties played any role in the decisions made by his trial attorney. *Burns*, 526 F.3d at 856-57. Bare allegations are insufficient to find ineffective assistance.

S. Reed fails to prove conflict of interest or ineffective assistance of counsel and his Motions are accordingly denied on this count.

      2.    <u>Pinkerton</u>

          (a)    <u>S. Reed's Arguments</u>

S. Reed argues that the Court gave an erroneous Pinkerton instruction to the jury. (R. Doc. 329-1 at 9-10). Specifically, S. Reed argues the Court should have instructed the jury that a

co-conspirator may be responsible for the *substantive* offenses committed by another co-conspirator. Rather, the Court instructed the jury that S. Reed could be guilty even if he did not participate in any of the acts that constitute the offense described in the conspiracy count. *Id*. at 9. Because of this error, S. Reed argues, he should not be held liable for Counts 7 and 9 and should be given a new trial on Count 1 because the jury could have interpreted the Court's words to mean S. Reed could be liable even without proof that he entered into an agreement.

(b)     <u>Government's Arguments</u>

The Government first points out that no party objected to the Court's *Pinkerton* instructions at trial, and S. Reed is therefore not permitted to assign error now. Second, the Government argues any error was harmless because the evidence against S. Reed was so overwhelming. (R. Doc. 337 at 70-71).

(c)     <u>Analysis</u>

S. Reed argues that the Court's *Pinkerton* instruction, an instruction to which he did not object during trial, suggested that the jury could convict S. Reed on Count One (conspiracy) under the *Pinkerton* principle. He suggests that this caused the jury to convict him on Counts 7 and 9 and may have confused the jury into convicting him for Count 1. At trial, the Court instructed the jury:

> Now, a conspirator is responsible for offenses committed by the other conspirator if the conspirator was a member of a conspiracy when the offense was committed and if the offense was committed in furtherance of or a foreseeable consequence of the conspiracy. Therefore, if you have found a defendant guilty of a conspiracy in Count 1, and if you find beyond a reasonable doubt that during the time the defendant was a member of that conspiracy the other conspirator committed the offense in Count 1 in furtherance of or as a foreseeable consequence of that conspiracy, then you may find the defendant guilty of Count 1 even though the defendant may not have participated in any of the acts which constitute the offense described in Count 1.

83

(R. Doc. 314 at 122). Under *Pinkerton*, a co-conspirator is criminally responsible for the acts of his co-conspirators when those actions where in furtherance of the conspiracy, whether or not he was aware of the actions. S. Reed argues that the jury may have understood the Court's instruction to mean that S. Reed could be convicted of conspiracy even if he did not participate in the conspiracy.

First, S. Reed did not object to the *Pinkerton* instruction at trial, despite the opportunity to do so. Fed. R. Cr. P. 30(d) states:

> A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. An opportunity must be given to object out of the jury's hearing and, on request, out of the jury's presence. Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b).

"A party generally may not assign error to a jury instruction if he fails to object before the jury retires or to 'stat[e] distinctly the matter to which that party objects and the grounds of the objection.'" *Jones v. United States*, 527 U.S. 373, 387 (1999) (quoting Fed. R. Crim. P. 30). Accordingly, the Court was unaware of S. Reed's issue with its instruction and was unable to take corrective measures at trial, if appropriate. Accordingly, S. Reed's objection is untimely.

Further, "[a] district court's error in giving the jury instructions is subject to harmless error review." *United States v. Skilling*, 554 F.3d 529, 547-48 (5th Cir. 2009) (citations omitted); *see also Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). Looking to the jury instructions as a whole and the quantum of the evidence, it is apparent that the instruction, if unclear, was harmless. *Skilling*, 554 F.3d. at 551.

For example, the Court also included the following instruction: "Each count, and the evidence pertaining to it, should be considered separately. The case of each defendant should be considered separately and individually. The fact that you may find one of the accused guilty or

not guilty of any of the crimes charged should not control your verdict as to any other crime or any other defendant. You must give separate consideration to the evidence as to each defendant." (R. Doc. 241 at 12-13). The Court further instructed that to find the defendants guilty of conspiracy, the jury must find that "the defendants made an agreement to commit the crimes of wire fraud…and/or money laundering…" and that "one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the superseding indictment." *Id*. at 18. Further, "A conspirator is responsible for offenses committed by the other conspirator if the conspirator was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of, or as a foreseeable consequence of, the conspiracy." *Id*. at 20.

As has been detailed throughout this opinion, the quantum of the evidence presented at trial was sufficient for a reasonable jury to convict both S. Reed and W. Reed of conspiracy and the related offenses of mail fraud, wire fraud, and money laundering. Accordingly, S. Reed's motion on this basis is denied.

3.    <u>Sufficiency of the Evidence</u>

(a)    <u>S. Reed's Arguments</u>

<u>*Conspiracy*</u>

S. Reed also argues that the Government failed to prove a conspiracy and he should be granted acquittal or, alternatively, a new trial. (R. Doc. 329-1 at 10-15). The fact that S. Reed and W. Reed are family is not sufficient to prove an agreement or plan. S. Reed avers that all of the transactions between himself and W. Reed were discreet transactions for services rendered, and no overarching plan or conspiracy existed. S. Reed cites various cases requiring a plan or agreement to commit further crimes in order to find a conspiracy. *See*, *e.g.*, *United States v. Gee*, 226 F.3d 885, 895 (7th Cir. 2000); *United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993);

*United States v. Townsend*, 924 F.3d 1365, 1394 (7th Cir. 1991). S. Reed argues that there was

no agreement or overarching plan, and the Government failed to prove one. *Id*. at 10-11.

On the sole conviction for money laundering, S. Reed argues he only received the check

and deposited it. He had no further involvement, and therefore did not participate in a

conspiracy. On the wire fraud counts, S. Reed avers the Government failed in various respects.

First, the Government failed to prove interstate commerce on the Globop count, making the

underlying wire fraud untenable. Secondly, the Government failed to prove conspiracy regarding

the Open House. The evidence showed that most of the guests were contributors or politicians,

making the party a valid dual-purpose under the state campaign finance laws. Furthermore, S.

Reed performed the work for which he was paid for that event. (R. Doc. 392-1 at 13-14).

Thirdly, S. Reed argues he was not involved in the payment to Liquid Bread, and the money

came as a surprise. If all those charges are dismissed, only one count would remain, the payment

for providing liquor, and one single transaction cannot prove a conspiracy. *Id*. at 14.

Finally, S. Reed argues that he had no stake in being paid from W. Reed's campaign

fund, and thus had no stake in the alleged conspiracy. *Id*.

<u>*Count 9 – the $5,000 Payment to Cayman Sinclair*</u>

S. Reed avers that the Government did not produce any evidence that he intended to

conceal the origin of the $5,000 check. W. Reed and Cayman Sinclair both testified at trial that

they were involved in agreeing to cut the check. Further, S. Reed argues there was no evidence

that S. Reed had the knowledge or background necessary to understand that a bank check would

more easily conceal the source of the funds.

(b)      <u>Government's Arguments</u>

<u>*Conspiracy*</u>

86

The Government avers that S. Reed's allegations that the Government failed to prove conspiracy because they did not prove he made any forward-looking agreement, they did not prove he had any stake in the outcome of the conspiracy, and because they failed to prove the objects themselves, fail to take into account the full weight of the Government's evidence at trial, and fail to understand the elements of conspiracy. *Id.* at 71-74.

An agreement does not have to be explicit, and the elements of a conspiracy can be inferred from circumstantial evidence. *See*, *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994); *United States v Mann*, 161 F.3d 840, 847 (5th Cir. 1998). The Government argues that the jury heard sufficient evidence to conclude that W. Reed and S. Reed made an agreement, including inflated and fraudulent invoices, S. Reed's changing stories, and his cooperation with his father. Further, having a stake in the outcome is not essential to prove a conspiracy, and ample evidence exists to show S. Reed participated in the conspiracy. Finally, proof of a conspiracy does not require proof of all elements of the underlying substantive offenses. *See*, *United States v. Adair*, 436 F.3d 520, 525 (5th Cir. 2006). Accordingly, the Government argues that S. Reed's Motion should fail.

Count 9 – the $5,000 Payment to Cayman Sinclair

The Government highlights that to prove Count Nine, they had to prove that S. Reed knowingly conducted a financial transaction, that that transaction involved proceeds of wire fraud, that the S. Reed knew the property involved was the proceeds of wire fraud, and that S. Reed knew the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the wire fraud. (R. Doc. 337 at 74-75). S. Reed argues that the Government did not prove he intended the transaction to conceal the origin of the $5,000 at issue. However, the Government argues that it is sufficient for the

defendant to be aware of the co-defendant's intent to conceal, and that concealment does not need to be the primary purpose of the transaction. *See*, *Adair*, 436 F.3d at 324; *United States v. Powers*, 168 F.3d 741, 747 (5th Cir. 1999). The Government avers that it provided sufficient evidence at trial to conclude that concealing the nature of the funds was at least one purpose of the transaction, and, having heard that evidence, the jury chose to convict on that count.

(c)     Analysis

In making the above arguments, S. Reed focuses primarily on the evidence most favorable to him. However, the jury heard this evidence at trial along with other evidence the Government introduced that was less favorable to S. Reed's case.

As was explained in the Court's response to W. Reed's Motions above, it is the jury's unique role to determine the credibility of witnesses and to weigh the sufficiency of the evidence, and the Court must accept those decisions and view the evidence in the light most favorable to the verdict. Accordingly, while S. Reed puts forward a feasible interpretation of certain evidence – an interpretation he also presented at trial – the jury ultimately did not find it credible. Viewing the evidence in the light most favorable to the verdict, the Court finds the jury's verdict reasonable.

Many of S. Reed's arguments rely on the sufficiency of the evidence presented at trial. Specifically, he argues the Government failed to prove conspiracy, and looks to its failure to prove certain overt acts upon which the jury's finding of guilt may or may not have relied.

When determining whether there is sufficient evidence to support a conviction, the court should "determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *United Sates v. Pruneda-Gonzalez*, 953 F.2d 190,

193 (5th Cir. 1992). The jury has a unique role of judging the credibility of witnesses and determining how much weigh to give each witness; testimony. *See United States v. Layne*, 43 F.3d 127, 130 (5th Cir. 1995) (citing *United States v. Higdon*, 832 F.2d 312, 315 (5th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988)). Accordingly, the Court must "accept all credibility choices that tend to support the jury's verdict," recognizing that the jury was "free to choose among all reasonable constructions of the evidence." *United States v. Sneed*, 63 F.3d 381, 385 (5th Cir. 1995) (quoting *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991); *United States v. Chaney*, 964 F.2d 437, 448 (5th Cir. 1992)).

While S. Reed argues that he had no forward-looking involvement or intent to commit money laundering, or wire fraud, the Government introduced evidence at trial supporting its conspiracy charge. Further, the Court instructed the jury that they need only find that the Defendants had committed at least one of the twenty-one alleged overt acts alleged in the indictment. (R. Doc. 241 at 17-23, 32-34). Accordingly, there are twenty-one overt acts upon which the jury could have rendered its verdict, and arguments contesting only certain overt acts are therefore unavailing. *Jolley v. United States*, 232 F.2d 83, 88 (5th Cir. 1956) ("Nor was it necessary that the evidence establish the appellant's guilt of each and all of the overt acts charged, but only of the commission of any one or more thereof to effect the objects and purposes of the conspiracy."); *see also United States v. Adair*, 436 F.3d 520, 525 (5th Cir. 2006) ("The Government, in a conspiracy case, need not prove that a substantive crime was actually committed.").

Further, as was explained above, if the jury found S. Reed guilty of conspiracy, they did not need to find that he was guilty of the underlying crimes committed by W. Reed, and the Government presented evidence of a conspiracy at trial. For example, the Government presented

to the jury a series of inflated, fraudulent invoices S. Reed created and gave to W. Reed's

Campaign Fund. See Tr. Ex. 16, 18, 19, 20, 35, 36. The Government also presented evidence that

S. Reed was untruthful after the fact, arguing that he sought to cover up his illegal dealings. See

Tr. Ex. 40.02, 40.05, 41.01, 42; Doc. No. 307 at 114-17 (Amy Bailey), 146-48 (Steven Johnson).

Finally, it is worth noting that to prove a conspiracy, the Government does not have to

prove either a "stake in the outcome" or an overt agreement. *See*, *e.g.*, *United States v. Alvarez*,

610 F.2d 1250, 1256 (5th Cir. 1980); *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994).

Regarding Count 9, the Government did not need to prove that *personally* intended to

conceal the origin of the $5,000 check, only that S. Reed was aware of W. Reed's intent to

conceal. Further, the concealment does not need to be the primary purpose of the transaction.

*Adair*, 436 F.3d at 324; *United States v. Powers*, 168 F.3d 741, 747 (5th Cir. 1999). At trial, the

Government produced evidence showing that concealing the nature of the funds was at least one

purpose of the transaction. For example, the jury heard that W. Reed told Cayman Sinclair he

would have to accept $5,000 less to cater the America Event, but later arranged for Mr. Sinclair

to be paid the full amount, $5,000 of which he was instructed to pay to S. Reed's company,

Liquid Bread. (R. Doc. No. 306 at 193-200); Tr. Ex. 8.54, 8.56; 37.01, 37.02. Further, the

Government presented evidence that S. Reed lied about the nature of the checks after the fact.

(R. Doc. No. 307 at 108, 114-16).

While this Court again does not presume to know how the jury interpreted various pieces

of evidence, it does find that, given the totality of the evidence, a reasonable jury could have

found S. Reed guilty of Conspiracy and money laundering. It would be inappropriate for this

Court, post-trial, to re-weigh the evidence and overturn the verdict simply because another

interpretation of the evidence is possible. The Court must view the evidence in the light most

favorable to the verdict, and, having done so, the Court finds the jury's determination rational. The jury's determination on these counts is therefore upheld. Accordingly, S. Reed's Motion for Acquittal or New Trial on this basis is denied.

        4.    <u>Paternity</u>

        (a)    <u>S. Reed's Arguments</u>

Finally, S. Reed argues that the Government failed to prove that W. Reed is his father. (R. Doc. 329-1 at 18-19). Without that proof, the state campaign law requiring pay "commensurate with the services provided" would be inapplicable and there would be no pay limitation. At trial, the only proof presented that S. Reed was W. Reed's son was the testimony of Kenneth Lacour, the owner of Dakota Restaurant, and the testimony of Connie Grantham, W. Reed's sister, who testified that S. Reed was her nephew. Neither of those testimonies are sufficient under Federal Rule of Evidence 804. S. Reed avers this failure to prove paternity entitles him to a Judgment of Acquittal.

        (b)    <u>Government's Arguments</u>

The Government contests S. Reed's argument that they failed to prove that W. Reed was S. Reed's father. (R. Doc. 337 at 75-76). Specifically, the Government avers that they were under no obligation to prove paternity, as paternity is not an element of federal wire fraud. S. Reed argues that it is necessary to prove a violation of state law, but the Government rebuts, saying this prosecution was not for violating state law. The Government did not seek to enforce state law. State law was only used to establish W. Reed's *mens rea*, as the law put him on notice of what are and are not appropriate expenditures of state campaign funds. Further, the jury had ample evidence to conclude S. Reed was W. Reed's son, including the testimonies of W. Reed and Shawn Reed.

(c)    <u>Analysis</u>

While S. Reed argues that the Government was required to prove his paternity in order to convict him under the CFDA, neither W. Reed nor S. Reed were charged with violations of the CFDA, or any other state law. S. Reed's paternity had no bearing on his conviction for conspiracy, wire fraud, or money laundering, as paternity is not an element of any of those crimes. Further, under Rule 804, S. Reed's paternity *was* proven through the statement of his father, W. Reed. (R. Doc. 313 at 17) ("Q. Who was the person that put together the event, from the standpoint of catering, liquor, etc.? A. My son Steven."). Accordingly, S. Reed's arguments on this basis bear no weight and are denied.

## III.    CONCLUSION

Considering the foregoing and for the reasons detailed above,

**IT IS ORDERED** that W. Reed's Motion to for Arrest of Judgment or Acquittal is **DENIED**. **IT IS FURTHER ORDERED** that W. Reed's Motion for a New Trial **DENIED**. **IT IS FURTHER ORDERED** that S. Reed's Motion for Arrest of Judgment, Acquittal, or a New Trial **DENIED**.

New Orleans, Louisiana, this 28th day of November, 2016.

UNITED STATES DISTRICT JUDGE