**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 15-100** |
| **v.** | * | **SECTION: "L"** |
| **WALTER P. REED**<br>**STEVEN P. REED** | * | |

* * *

**MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S**
**MOTION FOR A PRELIMINARY ORDER OF FORFEITURE**

Pursuant to the Notice of Fraud Forfeiture in the Superseding Indictment, the government seeks, as part of the defendants' sentences, a preliminary order of forfeiture to consist of a money judgment against defendants Walter and Steven Reed jointly and severally in the amount of $78,539.11, and in the amount of $609,489.57 against Walter Reed individually. In support of its Motion for a Preliminary Order of Forfeiture, the United States of America respectfully submits as follows:

**PROCEDURAL HISTORY**

On October 22, 2015, a grand jury returned a 19-count Superseding Indictment against defendant Walter Reed ("W. Reed"), the former District Attorney for the 22nd Judicial District in the State of Louisiana, charging him with conspiracy to commit wire fraud and money laundering (Count 1), as well as with substantive counts of wire fraud (Counts 2-8), money laundering (Counts 9-10), false statements on income tax returns (Counts 11-14), and mail fraud (Counts 15-19). Rec. Doc. 64. W. Reed was alleged to have used his office and position to illegally funnel campaign funds to his son and co-defendant Steven Reed ("S. Reed"), to use campaign funds for personal expenses, to conceal income from the IRS, and to use the Office of District Attorney to enrich himself. *Id.* S. Reed was charged in four

of the 18 counts—respectively, the criminal conspiracy (Count 1), one count of wire fraud (Count 7), and two counts of money laundering (Counts 9-10). *Id.* Pursuant to Fed. R. Crim. P. 32.2(a), the government provided notice of its intent to seek forfeiture for Counts 1-10 and 15-19. *Id.* at 28-31.

On May 2, 2016, following an 11-day trial, a jury acquitted both W. Reed and S. Reed of the Count 10 money laundering charge and convicted them of all other counts with which they were charged. Rec. Doc. 247. By the consent of the parties, the forfeiture determination was left to the Court to resolve. Rec. Doc. 314 at 159-61. Both defendants filed post-trial motions challenging their convictions, which the Court denied in all respects. Rec. Doc. 353.

The government now moves for a preliminary order of forfeiture to comport with Fed. R. Crim. P. 32.2(b)(2)(B) and to allow for the resolution of forfeiture well in advance of sentencing.

## <u>FORFEITURE PROCEDURE</u>

After a jury returns a guilty verdict on any count of an indictment for which criminal forfeiture is sought, the court "must determine what property is subject to forfeiture under the applicable statute." Fed. R. Crim. P. 32(b)(1)(A). "If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." *Id.* A money judgment is appropriate where, as here, the government seeks forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). *See United States. v. Nagin*, 2016 WL 98478, at *4 (5th Cir. Jan. 7, 2016) ("[T]he combined operation of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) authorizes personal money judgments as a form of criminal forfeiture."); *see also United States v. Thomas*, 2015 WL 4730718, at *3 (E.D. La. Aug. 10, 2015) (Duval, J.). The amount of the money judgment must be specified in a preliminary order of forfeiture made part of the defendant's sentence. Fed. R. Crim. P. 32(b)(2)(A). "The [C]ourt must include the forfeiture when orally announcing the

sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing[,]" and the Court "must also include the forfeiture order, directly or by reference, in the judgment[.]" Fed. R. Crim. P. 32(b)(4)(B). The Court must look to each count of conviction to "identify the specific statutory basis for forfeiture setting forth the requisite nexus between the crime and any money or property connected to that crime," and the government must prove that nexus by a preponderance of the evidence. *United States v. St. Pierre*, 809 F. Supp. 2d 538, 541-42 (E.D. La. 2011) (Fallon, J.) (citing Fed. R. Crim. P. 32.2(b)(1)(A); *United States v. Juluke*, 426 F.3d 323, 326 (5th Cir. 2005)).

In determining the amount of the forfeiture order, the Court may consider any record evidence, Fed. R. Crim. P. 32.2(b)(1)(B), and it need only make "a reasonable estimate" of the forfeitable sum, given the available information. *United States v. Jiau*, 624 F. App'x 771, 773 (2d Cir. 2015). In a conspiracy case, "co-conspirators subject to criminal forfeiture are held jointly and severally liable for the full amount of the proceeds of the conspiracy." *Nagin*, 2016 WL 98478, at *4; *see also St. Pierre*, 809 F. Supp. 2d at 544; *United States v. Edwards*, 303 F.3d 606, 643 (5th Cir. 2002).

## SUMMARY OF THE ARGUMENT

As the defendants stand convicted of the Count 1 conspiracy to commit wire fraud and money laundering, this Court should render, as part of their sentences, a preliminary order of forfeiture in the form of a personal money judgment against them jointly and severally for the proceeds of the offense. As discussed *infra*, that sum totals $78,539.11. In addition, W. Reed stands convicted of six discrete acts of wire fraud separate and apart from the Count 1 conspiracy (Counts 2-6, 8), as well as five counts relating to a mail fraud scheme whereby he funneled payments to his own personal accounts that were designated for the Office of the District Attorney (Counts 15-19). The proceeds from the wire fraud offenses and mail fraud scheme total $609,489.57, and as such, the preliminary order of forfeiture should include a personal money judgment against W. Reed for that sum, as well.

## LAW AND ARGUMENT

### I. Law Governing the Forfeiture at Issue

There is no master forfeiture statute, and the Court must instead look to the specific counts at issue and undertake what has been characterized as a "pinball journey through the federal code." *United States v. Nacchio*, 2007 WL 2221437, at *2 (D. Colo. 2007), *rev'd on other grounds*, 573 F.3d 1062, 1090 (10th Cir. 2009). As set forth in the Notice of Forfeiture included in the Superseding Indictment, Rec. Doc. 64 at 28-29, forfeiture pursuant to the Count 1 conspiracy (18 U.S.C. § 371), the Count 2-8 wire fraud offenses (18 U.S.C. § 1343), and the Count 15-19 mail fraud scheme (18 U.S.C. § 1341) is governed by the provisions of 18 U.S.C. § 981(a)(1)(C), made applicable to criminal proceedings through 28 U.S.C. § 2461(c). Under 18 U.S.C. § 981(a)(1)(C), the defendants are required to forfeit "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." The definition of "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(A) includes "any act or activity constituting an offense listed in section 1961(1) of this title," and 18 U.S.C. § 1961(1), in defining "racketeering activity," includes § 1343 (wire fraud), § 1341 (mail fraud), and § 1956 (money laundering) offenses.[1]

### II. Property Subject to Forfeiture

i. Proceeds from the Conspiracy (Count 1)

[1] Forfeiture is not available for the Count 11-14 tax offenses, and forfeiture pursuant to the Count 9 money laundering offense is governed by the provisions of 18 U.S.C. § 982(a)(1), under which the defendants are required to forfeit "any property, real or personal, involved in [the] offense, or any property traceable to such property." But we need not forfeit pursuant to the Count 9 conviction nor resort to § 982(a)(1) because the money laundering offenses of Counts 9 and 10 also were alleged as overt acts of the Count 1 conspiracy, forfeitable under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) as proceeds of the fraud. The fact that the jury returned an acquittal on the Count 10 money laundering charge does not preclude the forfeiture of the proceeds relating to the same fraudulent acts following the Count 1 conviction. *See United States v. Hasson*, 333 F.3d 1264, 1269 n.19 (11th Cir. 2003) (forfeiture amount may be based on amounts defendant conspired to launder, including amounts derived from substantive counts for which he defendant was acquitted).

Walter and Steven Reed are jointly and severally liable to forfeit the proceeds from their agreement to commit fraud and launder money, as alleged in Count 1 and proved at trial. The forfeitable sum totals $78,539.11.

Since at least 2009, W. Reed used money from his campaign account for purposes unrelated to the campaign. He spent some of the money to enrich S. Reed by providing inflated payments for services that were not performed, were not worthy of the large sums remitted, or were not related to his campaign or the holding of public office. Included among these expenditures was $14,300 to S. Reed's company Globop for a brief, amateur public service announcement video, Tr. Ex. 16, 18, 19, 20, 137, $8,358.76 to Globop for services provided during an April 2012 housewarming party that masqueraded after-the-fact as a campaign event but bore none of the hallmarks of such an event,[2] Tr. Ex. 8.61, 8.62, 145, and $29,400 to S. Reed's company Liquid Bread for unspecified "bar services" at a legitimate campaign event headlined by the band America (the "America Event") which, in fact, saw no such services performed, Tr. Ex. 13.02, 13.03, 35, 36, 8.09, 12.03, 145. *See also* Rec. Doc. 337 at 3-6 (Gov.'s omnibus opposition to defendants' post-trial motions ("Gov. Omnibus Opp."), describing the evidence adduced at trial proving the illegitimacy of such payments). W. Reed also funneled campaign funds to S. Reed through third-party vendors for the America Event. For example, W. Reed initially agreed to pay $35,000 for event catering before demanding the same services for $5,000 less; he then remitted the entire $35,000 before demanding from the caterer a "refund" of $5,000 to S. Reed's company Liquid

[2] For example, there was no request for or mention of donations; no campaign-, office-, or position-related signs, banners, or paraphernalia present; and no campaign drinking cups that were typically used for such events. Rec. Doc. No. 307 at 19-20; *compare* Tr. Ex. 39. The party invitations were not ordered by any of the people involved with planning and coordinating W. Reed campaign events, and they made no reference to W. Reed's position as District Attorney or a campaign. Rec. Doc. 43 at 3. An ADA who had worked at numerous W. Reed campaign events testified that the event was not campaign-related, and that he was neither expected to volunteer at the event nor to wear a certain uniform, but instead, to attend "like a regular person." Rec. Doc. 309 at 42 (describing a "night and day" difference between the housewarming party and W. Reed's campaign events).

Bread in the form of a cashier's check so as to hide the source of the payment. Rec. Doc. 306 at 193-200; Tr. Ex. 8.54, 8.56, 37.01, 37.02. For the same event, he inflated a payment to a different entertainment vendor with instructions that the vendor hire S. Reed and pay his company, Globop, at an overpriced rate of $5,000. Rec. Doc. 306 at 220-24; Tr. Ex. 8.55, 11.02, 138, 147, 151.

Finally, as part of the conspiracy, W. Reed made other payments from the campaign account to purchase additional products and services for the April 2012 housewarming party, including $221.95 to Kentzel's Printing for the invitations; $1,351.24 to Martin Wine Cellar for the alcohol; $3207.16 to Coles Rental World for tables, chairs, and a generator; $4,700 to Charles Gambino for catering; and $7,000 to Vince Vance & Valiants for live musical entertainment. Tr. Ex. 8.03, 8.04, 8.59, 8.60, 8.61, 8.62, 8.63, 43, 44.

In all, the proceeds from these fraudulent payments total $78,539.11, as outlined in the chart below and established at trial:

| Event | Amount | Date | Payable To | Payable From | Trial Exhibit |
|---|---|---|---|---|---|
| | | | | | |
| video | $5,000.00 | 3/27/2009 | Globop | Campaign | 137 |
| video | $4,800.00 | 4/1/2009 | Globop | Campaign | 137 |
| video | $2,000.00 | 6/12/2009 | Globop | Campaign | 137 |
| video | $2,500.00 | 10/5/2009 | Globop | Campaign | 137 |
| housewarming | $7,806.12 | 4/13/2009 | Globop | Campaign | 8.61 |
| housewarming | $552.64 | 4/22/2009 | Globop | Campaign | 8.62 |
| housewarming | $221.95 | 3/28/2012 | Kentzel's Printing | Campaign | 8.03 |
| housewarming | $1,351.24 | 4/10/2012 | Martin Wine Cellar | Campaign | 8.59 |
| housewarming | $2,769.96 | 4/14/2012 | Coles Rental World | Campaign | 8.60 |
| housewarming | $437.20 | 4/17/2012 | Coles Rental World | Campaign | 8.59 |
| housewarming | $3,700.00 | 4/9/2012 | Charles Gambino | Campaign | 8.03 |
| housewarming | $1,000.00 | 4/14/2012 | Charles Gambino | Campaign | 8.04 |
| housewarming | $3,000.00 | 1/30/2012 | Vince Vance & Valiants | Campaign | 8.63 |
| housewarming | $4,000.00 | 4/14/2012 | Vince Vance & Valiants | Campaign | 8.04 |
| America Event | $5,000.00 | 9/25/2012 | Liquid Bread | Lake House | 37.01 |
| America Event | $5,000.00 | 9/25/2012 | Globop | White Oak | 11.02 |
| America Event | $29,400.00 | 10/5/2012 | Liquid Bread | Campaign | 8.09 |
| | **$78,539.11** | | | | |

Both Walter and Steven Reed are jointly and severally responsible for the full $78,539.11. *See Nagin*, 2016 WL 98478, at *4 ("Co-conspirators subject to criminal forfeiture are held jointly and severally liable for the full amount of the proceeds of the conspiracy."); *St. Pierre*, 809 F. Supp. 2d at 544, 546 (holding payor of bribe liable for value of the bribe received by coconspirator payee).

Where a case involves a conspiracy, the amount involved in the entire scheme is forfeitable, including proceeds from acts for which the defendant was not personally responsible. *See United States v. Hasson*, 333 F.3d 1264, 1269 n.19 (11th Cir. 2003) (forfeiture amount may be based on amounts defendant conspired to launder, including amounts derived from uncharged substantive conduct or substantive counts for which the defendant was acquitted); *United States v. Royer*, 549 F.3d 886, 904 (2d Cir. 2008) (requiring defendant convicted of conspiracy to commit securities fraud and four substantive counts of such fraud to forfeit gains realized by others to whom he provided inside information, not just the gains related to the counts in which he profited personally); *United States v. Hatfield*, 795 F. Supp. 2d 219, 227 (E.D.N.Y. 2011) (requiring defendant convicted of conspiracy to commit securities fraud to forfeit proceeds from the entire conspiracy, including proceeds resulting from acts for which he was not personally responsible). Thus, even if S. Reed was not personally involved in facilitating payments from the campaign fund for products and services for W. Reed's housewarming party, his role in the conspiracy nevertheless renders him liable for those fraudulent expenditures.

ii. Proceeds from the Wire Fraud Offenses (Counts 2-8)

Walter Reed is liable to forfeit the proceeds from the wire fraud offenses in Counts 2-8. Because the proceeds from Count 7 also are forfeitable pursuant to the Count 1 conspiracy conviction, they will be omitted from this analysis to avoid double-counting. The proceeds from

the other six wire fraud offenses total $35,426.32.

As alleged in Counts 2-8 and as proved at trial, W. Reed fraudulently used money from his campaign account to recruit clients for his private legal practice—obtaining client referrals through the relationships that he developed with Pentecostal ministers and nurtured with liberal spending of his campaign funds. *See* Rec. Doc. 337 at 6-8 (Gov. Omnibus Opp., describing the evidence adduced at trial proving the use of such funds). Among these expenditures were $2,635 for a steak dinner held annually for ministers and their wives, Rec. Doc. 309 at 170-72; Tr. Ex. 87, 88, $25,000 as a referral fee directed to the reverend-host of that dinner for business sent W. Reed's way, Rec. Doc. 309 at 179-82; Tr. Ex. 8.11, and $4,701.74 for a prime rib dinner hosted by another reverend for a large group of pastors and their wives, Rec. Doc. 310 at 30; Tr. Ex. 8.16. W. Reed also spent campaign funds on personal affairs (*i.e.*, unrelated to the campaign or the holding of public office), including flowers for family, gifts for women he wanted to impress, lavish holiday meals for close family and personal friends, and gift cards for personal use at local restaurants. *E.g.*, Tr. Ex. 8.12, 8.15, 8.23; Rec. Doc. 337 at 8-9 (Gov. Omnibus Opp., describing the evidence adduced at trial proving the use of such funds).

In all, the proceeds from just those fraudulent expenditures alleged in Counts 2-6 and Count 8 total $35,426.32, as outlined in the chart below:

| Count | Amount | Date | Payable To | Payable From | Trial Exhibit |
|---|---|---|---|---|---|
| | | | | | |
| **2** | $2,635.00 | 6/14/2010 | Gerald's Steakhouse | Campaign | 8.10, 87, 88 |
| **3** | $589.68 | 6/15/2010 | Annadelle's Plantation | Campaign | 8.12 |
| **4** | $1,885.36 | 11/24/2011 | Dakota Restaurant | Campaign | 8.15 |
| **5** | $614.49 | 4/23/2012 | Flowers N Fancies | Campaign | 8.23 |
| **6** | $4,701.79 | 8/29/2012 | First Pentacostal Church | Campaign | 8.16 |
| **8** | $25,000.00 | 11/1/2013 | Faith Tabernacle Church | Campaign | 8.11 |
| | **$35,426.32** | | | | |

iii. Proceeds from the Mail Fraud Scheme (Counts 15-19)

Finally, Walter Reed is liable to forfeit the proceeds from the mail fraud scheme alleged in Counts 15-19, totaling $574,063.25

For decades, Assistant District Attorneys, acting in their official capacities, had been assigned to advise Parish governmental institutions on legal matters. Since at least 1974, the Office of the District Attorney sent an ADA from its Civil Division to advise the St. Tammany Parish Hospital Board of Directors at its monthly meeting. Rec. Doc. 308 at 102; Rec. Doc. 309 at 6-8. In 1992, at W. Reed's request, the Hospital passed a resolution developing a fee arrangement that paid the Office of the District Attorney a monthly retainer of $2,084. Tr. Ex. 49. W. Reed began attending the meetings in May 1994 and pocketing the entire retainer for himself rather than depositing the checks into one of the Office's accounts. Rec. Doc. 312 at 5-6; Rec. Doc. 313 at 64-65, 106-07. That retainer was formally increased to $2,247.75 per month[3] in June 1994, Tr. Ex. 47.03 at 5, 11-12, and increased again in March 2011, this time to $2,500 per month, Tr. Ex. 53, 47.18 at 3. From 1994 to 2014, W. Reed occasionally would direct an ADA—in the course of his employment—to attend the meetings in his place, though the ADA never was paid extra for this work. Rec. Doc. 309 at 14-15, 30-37; Tr. Ex. 141. W. Reed always claimed these payments for himself.

The proceeds from the 20 years' of fraudulent receipts for these payments total $574,063.25, as outlined in the chart below:

[3] A proposed resolution that W. Reed purportedly submitted to the Hospital Board, and which the board indisputably *did not pass*, suggests that Reed had received $2,247.75 since May 1994, Tr. Ex. 76, even though the Board formally raised the DA's Office's retainer to $2,247.75 in late June 1994, Tr. Ex. 47.03. If the Court were to find this proposed resolution insufficient to demonstrate Reed's receipt of the greater amount before July 1994, the forfeitable sum would be $327.50 less than what the government calculates below.

| Year | Months | Amount | Yearly Total | Trial Exhibit |
|---|---|---|---|---|
| | | | | |
| 1994 | 8 | $2,247.75 | $17,982.00 | 47.03, 50, 76 |
| 1995 | 12 | $2,247.75 | $26,973.00 | |
| 1996 | 12 | $2,247.75 | $26,973.00 | |
| 1997 | 12 | $2,247.75 | $26,973.00 | |
| 1998 | 12 | $2,247.75 | $26,973.00 | |
| 1999 | 12 | $2,247.75 | $26,973.00 | |
| 2000 | 12 | $2,247.75 | $26,973.00 | |
| 2001 | 3 | $2,247.75 | $6,743.25 | |
| 2001 | 9 | $2,500.00 | $22,500.00 | 47.18, 53, 56 |
| 2002 | 12 | $2,500.00 | $30,000.00 | |
| 2003 | 12 | $2,500.00 | $30,000.00 | |
| 2004 | 12 | $2,500.00 | $30,000.00 | |
| 2005 | 12 | $2,500.00 | $30,000.00 | |
| 2006 | 12 | $2,500.00 | $30,000.00 | |
| 2007 | 12 | $2,500.00 | $30,000.00 | |
| 2008 | 12 | $2,500.00 | $30,000.00 | |
| 2009 | 12 | $2,500.00 | $30,000.00 | |
| 2010 | 12 | $2,500.00 | $30,000.00 | |
| 2011 | 12 | $2,500.00 | $30,000.00 | |
| 2012 | 12 | $2,500.00 | $30,000.00 | |
| 2013 | 12 | $2,500.00 | $30,000.00 | |
| 2014 | 2 | $2,500.00 | $5,000.00 | 68.17 |
| | | | | |
| | | | **$574,063.25** | |

Obviously, the $574,063.25 exceeds the $12,500 total from the five counts of conviction, each of which concerned a payment for $2,500 made on a discrete occasion between 2011 and 2014. Rec. Doc. 64 at 28; Tr. Ex. 68.13-68.17. But where a fraud case is alleged as a continuing scheme—as in this case, *see* Rec. Doc. 64 at 25-27—a defendant is liable for the full amount derived from the scheme, not just proceeds derived from the acts forming the basis of the substantive counts of conviction. *See, e.g.*, *United States v. Venturella*, 585 F.3d 1013, 1015, 1015-17 (7th Cir. 2009) (defendant's plea to one count of mail fraud involving $477 rendered her liable for a money judgment of $114,000, as forfeiture is "not limited to the amount of the particular mailing but extends to the entire scheme"); *United States v. Emor*, 850 F. Supp. 2d 176, 217

(D.D.C. 2012) ("When a defendant has engaged in a mail or wire fraud scheme, forfeiture is not limited to the proceeds gained through the particular mailing or wire transaction on which the conviction was based; rather, it extends to the entire scheme of which the mailing or wire transaction was a part.") (internal quotation marks omitted); *United States v. Yass*, 636 F. Supp. 2d 1177, 1185 (D. Kan. 2009) (requiring defendant convicted of mail fraud to forfeit the proceeds of the entire scheme, not just the proceeds linked to the six executions of the scheme alleged as substantive counts). Each of Counts 15-19 relate to a specific instance of mail fraud for which the proceeds are $2,500, but Reed is nevertheless liable to forfeit other proceeds obtained pursuant to the same scheme to defraud, within the time frame alleged in the indictment. *See* Rec. Doc. 64 at 25-27. This includes proceeds that might not have been obtained through use of the mails, *see United States v. Budden*, 2012 WL 1315366, *4 (D. S.C. April 17, 2012) (requiring defendant convicted of mail fraud to forfeit proceeds of the entire scheme, even if defendant used the mails only with respect to one of the many victims), and proceeds that might have been realized outside of the statute of limitations for the substantive offense of conviction, *see United States v. Sagillito*, 899 F. Supp. 2d 850, 861-62 (E.D. Mo. 2012) (requiring defendant to forfeit proceeds of the entire fraud scheme, even where some of the proceeds were realized outside of the five-year statute of limitations).

The government expects that W. Reed will raise two specific arguments to attempt to limit his financial exposure: First, that the forfeiture should be cabined only to those occasions on which W. Reed sent an ADA to the Hospital Board meetings in his place, and second, that the forfeiture should include only those payments received within 10 years from the date on which the case against W. Reed was first indicted.

The first argument is based on a theory, debunked at trial, that Reed was representing the

Hospital in his personal capacity rather than as a representative of the Office of the District Attorney, and that he was justified in retaining those payments for the work and relationship that *he*—and not an ADA operating at his command[4]—performed and maintained. But as demonstrated at trial, the Hospital needed the services of the Office of the District Attorney, and not a private attorney, to assist with its governmental affairs. Rec. Doc. 308 at 198-99 (stating that the purposes for which the District Attorney's Office was retained would not have been satisfied by hiring Walter Reed in his private legal capacity). As such, countless times over the past two decades, the Hospital formally recognized the Office of the District Attorney—and not W. Reed individually—as the party providing the necessary legal services.[5] And as this Court noted, the jury heard evidence concerning these "various resolutions and contracts passed by the Hospital board that indicated the Hospital was retaining the District Attorney in his official capacity," that "W. Reed knew about these resolutions," and that "W. Reed knew that any resolution drafted to retain him in his personal capacity had to be reviewed, discussed, voted on, and passed by the Hospital Board," none of which had occurred. Rec. Doc. 353 at 41-42 (Order on Post-Trial Motions). The Court recognized that "the jury clearly did not find W. Reed credible, and found it was improper for him to keep the money designated for the Office of the District Attorney." *Id.* at 42; *see also* Rec. Doc. 337 at 9-12 (Gov. Omnibus Opp., describing the evidence adduced at trial concerning

---

[4] From 1994 through March 2014, W. Reed instructed subordinates to attend Hospital Board meetings 61 times, but regardless whether Reed attended the monthly meetings or sent another ADA in his stead, Reed kept the payments for himself. Rec. Doc. 309 at 14-15, 30-37; Rec. Doc. 313 at 64-65, 106-07; Tr. Ex. 141.

[5] For example, the initial Hospital resolution establishing a fee arrangement assigned to "[t]he District Attorney's Office . . . a monthly retainer of $2,084.00." Tr. Ex. 49. When the Hospital increased the amount of the retainer in June 1994, it continued to recognize the payments as compensation to the "District Attorney's Office" for "legal services rendered by Assistant District Attorneys[.]" Tr. Ex. 47.03 at 5, 11-12; 50. When it increased the retainer yet again in March 2001, it again recognized that it was the "District Attorney's office" being "engaged as special counsel[.]" Tr. Ex. 47.18 at 3, 53. And when in 2008 the Hospital Board began a yearly review of the attorneys it retained and the amounts paid, it recognized the "St. Tammany Parish District Attorney," and, specifically, "Walter Reed, et al.," as one such provider of legal services. Tr. Ex. 58-64.

agreement, duties, and payment concerning services provided to the Hospital). The evidence presented at trial, and the jury's findings based on it, support forfeiture of all moneys remitted to the Office of the District Attorney yet kept by W. Reed; whether it was he or another attorney from the office who sat in on any particular Hospital Board meeting is of no consequence to the forfeiture inquiry.

Second, the government is not restricted in its forfeiture by a June 11, 2015 letter (the "Letter") from a then-member of the prosecution team to counsel for W. Reed that—if past discussions are any indication—Reed's counsel will argue now binds the government to a lesser forfeiture amount. That Letter was drafted in response to a Motion for a Bill of Particulars requesting explanation of the $365,934 figure alleged in the original Indictment's Notice of Fraud Forfeiture. *See* Ex. A (Gov. Letter to R. Simmons); Rec. Doc. 21 (Mot. for a Bill of Particulars). The Letter explained that the sum alleged to be forfeitable included, *inter alia*, the amount that W. Reed received from the Hospital "in the ten years prior to the date of the Indictment." *See* Ex. A at 2. But the Letter also cautioned that "the government expressly states that the forfeiture amount set forth in the indictment is a preliminary number and that it can, and likely will, change prior to the trial[.]" *Id.* That amount *did* change when the government learned the full extent of W. Reed's fraudulent receipt of Hospital funds owed to the Office of the District Attorney. When the government sent the Letter—three months before the Superseding Indictment was returned and 14 months before trial—it lacked sufficient evidence to establish conclusively that his fraud persisted for more than a decade. Testimony at trial finally established that W. Reed had attended the meetings and kept the monthly payments since 1994. *See* Rec. Doc. 313 at 64-65; 106-07.

The government was under no obligation to specify the precise amount that it would seek to forfeit, and W. Reed cannot now claim surprise based on a Letter received 18 months ago that

does not contain what reasonably could be construed as a promise to limit that forfeiture.[6]

## CONCLUSION

For the foregoing reasons, and pursuant to Fed. R. Crim. P. 32(b)(1)(A), the government respectfully requests that the Court enter a preliminary order of forfeiture to consist of a money judgment against defendants Walter and Steven Reed jointly and severally in the amount of $78,539.11 (the proceeds of the conspiracy), and in the amount of $609,489.57 against Walter Reed individually (the proceeds of the wire fraud offenses and the mail fraud scheme).

Respectfully submitted,

KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY

*<u>/s/ Jeffrey Sandman</u>*
JEFFREY SANDMAN
Assistant United States Attorney
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3055
Email: jeff.sandman@usdoj.gov

[6] Nor is the scope of the government's forfeiture limited by the language in the Superseding Indictment, which cautioned that the fraud forfeiture would total "at least $390,932.00." Rec. Doc. 64 at 28; *see also United States v. Marquez*, 685 F.3d 501, 509 (5th Cir. 2012) (recognizing that under Fed. R. Crim. P. 32.2(a), an indictment need not "specify the amount of any forfeiture money judgment that the government seeks"); *United States v. Poulin*, 461 F. App'x 272, 288 n.8 (4th Cir. 2012) (government was not required to specify any dollar amount in the indictment's notice of forfeiture, so notice that it would forfeit "at least $850,000.00" precluded defendant from claiming surprise when it sought to forfeit $1.3 million instead).