**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 15-100** |
| **v.** | * | **SECTION: "L"** |
| **WALTER P. REED**<br>**STEVEN P. REED** | * | |

* * *

**REPLY MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S**
**<u>MOTION FOR A PRELIMINARY ORDER OF FORFEITURE</u>**

**A. Proceeds from the Conspiracy (Count 1)**

Following the Reeds' conspiracy conviction, the Court must now decide, by a preponderance of the evidence presented at the trial and the hearing on this motion, whether the Reeds committed the overt acts to defraud the campaign fund as alleged in the superseding indictment, thus making them liable, jointly and severally, to forfeit those funds fraudulently spent.

*i. Open House ($24,840.11)*

The Reeds contend that the open house party was in fact a political event because the guest list primarily consisted of W. Reed's supporters and fundraisers, as well as other elected officials and political figures. *See* Rec. Doc. 364 at 2-3; Rec. Doc. 365 at 8. This is the only evidence to which they point to demonstrate the legitimacy of the expenditures related to that event. True, campaign funds may underwrite political functions that do not bear a fundraising component. But the housewarming party bore *none* of the hallmarks of a political event, fundraiser or otherwise, *see* Rec. Doc. 361-1 at 5 n.2, and the presence of those who had donated to previous campaigns does not convert a private party into a campaign event.

Once the Court concludes that the government established, by a preponderance of the evidence, that the open house was not campaign-related, the expenditures related to that event are

forfeitable in their entirety, and the Reeds miss the mark in arguing that payments made to innocent third-party vendors do not qualify as "proceeds" under 18. U.S.C. § 981(a)(2). Congress has defined "proceeds" to mean either gross receipts or net profits, depending on the circumstances of the offense. *Compare* § 981(a)(2)(A) *with* § 981(a)(2)(B).[1] But even applying the defendants' preferred statute, W. Reed's personal expenditures drawn from his campaign fund, even those paid to innocent third parties, should not be excluded from the forfeiture. These are not, in the language of § 981(a)(2)(B), "direct costs incurred in providing the goods or services"—*i.e.*, collateral expenses separate from the fraud—but instead are the very payments constituting the fraud in the first place.

S. Reed also suggests that "[r]eimbursement for payments to innocent third parties is not an ill-gotten gain" and is not forfeitable because W. Reed never "acquired" the campaign account funds used for those payments. Rec. Doc. 364 at 5-6; § 981(a)(2)(B) (defining "proceeds" as money "acquired" through the illegal transactions, less direct costs). But of course he did—functionally if not literally—the moment that he directed their transfer from the campaign account to third parties.[2] Even his own authorities support this conclusion. *See* Rec. Doc. 364 at 5; *United*

---

[1] In cases involving "illegal goods," "illegal services," and "unlawful activities," *inter alia*, "proceeds" are defined by § 981(a)(2)(A) to include "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to the forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." By contrast, in cases involving "lawful goods or lawful services that are sold or provided in an illegal manner," § 981(a)(2)(B) governs, defining "proceeds" as "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." S. Reed assumes the application of the latter definition, noting that the goods and services fraudulently purchased were "lawful in and of themselves." Rec. Doc. 364 at 4. In *United States v. St. Pierre*, 809 F. Supp. 2d 538 (E.D. La. 2011) (Fallon, J.), this Court applied § 981(a)(2)(B) in a case involving the bribery of a public official to obtain business with the City of New Orleans. *Id.* at 543. But in fraud cases like the instant one, other courts have characterized the fraud itself as the "unlawful activity" and applied § 981(a)(2)(A) to disgorge not just profits but total receipts. *See United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (applying § 981(a)(2)(A) to mail and wire fraud offenses); *United States v. Yass*, 636 F. Supp. 2d 1177, 1184 (D. Kan. 2009) (applying § 981(a)(2)(A) to mail fraud and conspiracy to commit mail fraud offenses); *United States v. Warshak*, No. 06–111, 2008 WL 2705044, at *4 (S.D. Ohio, July 8, 2008) (applying § 981(a)(2)(A) to consumer fraud scheme).

[2] Alternatively, even if W. Reed did not "acquire" the campaign account funds, he certainly acquired the goods and services fraudulently purchased with those funds. As those goods and services already have been consumed, a

*States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) ("While property need not be personally or directly in the possession of the defendant, his assignees, or his co-conspirators in order to be subject to forfeiture, the property must have, at some point, been under the defendant's control or the control of his co-conspirators in order to be considered acquired by him." (internal quotation marks and citations omitted)); *United States v. St. Pierre*, 809 F. Supp. 2d 538, 545 (E.D. La. 2011) (Fallon, J.) (considering whether defendant "directly or indirectly acquired *or otherwise benefitted* from the share of the revenues that went to his unindicted business partners") (emphasis added)). By S. Reed's logic, a credit card thief would not have to forfeit the value of items he purchased with a stolen card so long as the seller of those items was not complicit in the theft. But there, as here, the good faith of the parties accepting the fraudulent payment is irrelevant, and Reed must forfeit the value of those goods and services illegally procured with campaign account funds.[3]

*ii. Globop Drug Abuse Video ($14,300)*

S. Reed's $14,300 invoice for video production work also is forfeitable in its entirety. The Reeds attempt to diminish the forfeitable sum by assigning a $2,500 value to the amateurish drug abuse video and suggesting that the value of S. Reed's work was in fact even greater, even if the more sophisticated ideas were left on the cutting room floor at W. Reed's insistence. Rec. Doc. 364 at 7-8. But the Reeds do not explain why the *value* of the video or Steven's effort in creating

---

money judgment will suffice to disgorge the "ill-gotten gains."

[3] S. Reed recognizes that Fifth Circuit case law permits joint and several liability for money judgments imposed pursuant to a forfeiture order. Rec. Doc. 364 at 6 (citing *United States v. Nagin*, 810 F.3d 348, 353 (5th Cir.), *cert. denied*, 137 S. Ct. 41 (2016). And although he suggests a changing tide following the D.C. Circuit's holding in *United States v. Cano–Flores* that joint and several liability is not available in drug forfeitures under 21 U.S.C. § 853, *see* 796 F.3d 83, 90–95 (D.C. Cir. 2015), the majority of circuit courts continue to impose joint and several liability among coconspirators for the proceeds of drug conspiracies under § 853. *See, e.g., United States v. Honeycutt*, 816 F.3d 362, 379 (6th Cir. 2016), *cert. granted*, No. 16-142, 2016 WL 4078900 (U.S. Dec. 9, 2016); *United States v. Roberts*, 660 F.3d 149, 165 (2d Cir. 2011); *United States v. Van Nguyen*, 602 F.3d 886, 904 (8th Cir. 2010); *United States v. Pitt*, 193 F.3d 751, 765 (3d Cir. 1999); *United States v. McHan*, 101 F.3d 1027, 1043 (4th Cir. 1996).

it has any bearing in the forfeiture analysis. Again, § 981(a)(2)(B) permits forfeiture of proceeds acquired through fraud, less "the direct costs incurred in providing the . . . services." But there is no evidence of any such "direct costs"—*e.g.*, fees paid to supporting audio or video technicians—that S. Reed incurred in producing the video. Absent such evidence, the entire sum is forfeitable as per the plain language of the statute.

The Reeds also contend that of the $14,300 invoiced for the drug abuse video, $2,500 was actually compensation for S. Reed's production of W. Reed's annual golf tournament and $2,000 was payment for pre-production work on a safe-driving video. Rec. Doc. 364 at 7; Rec. Doc. 364-2. The evidence simply does not support their claim, and they have failed to support their contention despite ample opportunity to do so. The government's evidence at trial included the $14,300 invoice for production of the video, Gov. Tr. Ex. 20, as well as three checks totaling $11,800 from the campaign fund to Globop with "juvenile drug video" or "anti-drug video" notated in the memo line, Gov. Tr. Ex. 137. A fourth check for $2,500 lists "golf tournament production" in the memo line, *id.*, but nowhere does a check denote payment for work on a safe-driving initiative, and S. Reed's self-serving declaration fails to explain away this discrepancy. Even taking that declaration at face value, the legitimacy of the campaign's expenditures—like other expenditures for work performed by S. Reed—is highly suspect. The trial saw no evidence of S. Reed's work related to the golf tournament or safe-driving video, and the $14,300 Globop invoice should suffice to prove the nature of the expenses. If the Reeds wish to challenge the government's characterization of these payments, they should be prepared to testify at the forfeiture hearing.

*iii. America Event Fundraiser ($39,400)*

The Reeds were convicted of wire fraud for the $29,400 payment to S. Reed for supplying the America Event with liquor from his bar at a heavily inflated price (Count 7) and were convicted

of money laundering for the $5,000 "refund" paid to S. Reed from the event's caterer at W. Reed's demand (Count 9). As these frauds also were alleged as overt acts furthering the Count 1 conspiracy, the Reeds acknowledge that the convictions suggest a jury finding that they committed the overt acts and that the funds are therefore forfeitable. Rec. Doc. 364 at 10-11. Nevertheless, they seek to deduct $7,548 in direct costs from the $29,400 that S. Reed received for supplying the event with alcohol based on estimates of the inventory that he provided for the event. Under § 981(a)(2)(B), "[t]he claimant shall have the burden of proof with respect to the issue of direct costs," and S. Reed offers vague, unsworn recollections but nothing in the way of proof to demonstrate what bottles were provided in what quantities, and at what costs to S. Reed himself. *See* Rec. Doc. 364 at 9-10. The Court should demand more exacting evidence before S. Reed can deduct any costs from the forfeitable sum.

The Reeds also challenge forfeiture of the $5,000 fraudulently funneled to S. Reed through White Oak and its owner Ed White, producers of the entertainment for the American Event. At W. Reed's insistence, Ed White hired S. Reed at the inflated sum of $5,000, and though S. Reed contends that his "qualifications made him worth the price," White's testimony revealed the absurdity of that price tag for a single night's work as a "production assistant." Rec. Doc. 396 at 220, 221-23. Although the Reeds were acquitted of the Count 10 money laundering charge relating to this $5,000 payment, Fifth Circuit precedent permits the Court to reexamine their conduct under the lesser preponderance of the evidence standard, as S. Reed recognizes. Rec. Doc. 364 at 9 (citing *United States v. Melancon*, 662 F.3d 708, 713 (5th Cir. 2011)). And close review is especially warranted here, given the different theories of liability for the offense conduct: Whereas Count 10 charged money laundering, Count 1 includes the White Oak payment as one of many overt acts supporting the *fraud* conspiracy. See Rec. Doc. 64 at 9.

Finally, although W. Reed claims that he reimbursed the campaign account the $5,000 payments to S. Reed's companies, he provides only a copy of the checks—purportedly cut several *years* later and less than a month before the indictment was returned—but not the slips proving those funds were even deposited into the campaign account. *See* Rec. Doc. 365 at 10; Rec. Doc. 365-1 at 3. His proof is not only uncompelling; it is irrelevant. Reed makes an argument for why the Court should not impose *restitution* for those frauds, but whereas the goal of restitution is to recoup the victim's loss, the goal of forfeiture is punitive. *See United States v. Taylor*, 582 F.3d 558, 566 (5th Cir. 2009). Reed's attempts to cover his tracks years after withdrawing the funds does not preclude the government from forfeiting the proceeds of his earlier frauds.

**B. Proceeds from the Wire Fraud Offenses (Counts 2-8)**

W. Reed contends that payments made from the campaign fund to innocent third parties should not be included in the forfeiture. *See* Rec. Doc. 365 at 11-12. For the reasons already discussed at pages 2-3, *supra*, moneys fraudulently drawn from the campaign account for non-campaign expenses are forfeitable, wherever they might end up. He also suggests that the funds used to purchase the dinner at Gerald's Steakhouse (Count 2) are not forfeitable because he reimbursed the campaign fund (again, years later and just weeks before the indictment was returned). *See* Rec. Doc. 365 at 12. For the reasons discussed in the preceding paragraph, his argument, relevant in opposing *restitution*, is inapposite here.[4]

**C. Proceeds from the Mail Fraud Scheme (Counts 15-19)**

W. Reed's opposition to the government's motion fails to rebut—indeed, fails even to *recognize*—the government's arguments and authorities in support of its forfeiture demand for

[4] Finally, W. Reed asserts without argument that the forfeiture should not include the funds used for the personal purchases of items alleged in Counts 3-6. As he was convicted on each of those counts, now he is liable to forfeit the corresponding proceeds.

proceeds of W. Reed's mail fraud scheme. W. Reed first contends that restitution is appropriate in lieu of forfeiture because the DA's Office bore no *statutory* duty to represent the St. Tammany Hospital Board, and the Board was in fact free to make contractual arrangements for legal services with Walter Reed the DA, Walter Reed the private attorney, or anyone else. Rec. Doc. 365 at 14-15. Why this matters is unclear, and Reed makes no effort to explain. The fact remains that the Hospital contracted with the *DA's Office* to provide legal services—despite Reed's clearly unsuccessful efforts to amend the agreement to assign that duty to himself in his individual capacity. *See* Rec. Doc. 361-1 at 11-13. Funds owed to the DA's Office but pocketed by Reed are proceeds of fraud and are properly forfeitable.

Moreover, restitution and forfeiture serve different ends and may be ordered in the same case. *Taylor*, 582 F.3d at 566 (order imposing both restitution and forfeiture was permissible); *see also id.* ("Forfeiture and restitution are distinct remedies. Restitution is remedial in nature, and its goal is to restore the victim's loss. Forfeiture, in contrast, is punitive; it seeks to disgorge any profits that the offender realized from his illegal activity.") (quoting *United States v. Webber*, 536 F.3d 584, 602-03 (7th Cir. 2008)). As the *Taylor* Court explained, both the Mandatory Victim Restitution Act and the forfeiture statute in fact *obligate* courts to impose the respective relief. *See id.* at 565 (noting that under the MVRA, the district court "*shall order*, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim," and under 28 U.S.C. § 2461(c), when a defendant has been convicted of an offense for which civil forfeiture is authorized, the district court "*shall order* the forfeiture of the property as part of the sentence" (emphasis added, citations omitted)).

W. Reed next argues that the government is bound by a June 11, 2015 letter from a then-member of the prosecution team drafted in response to Reed's motion for a bill of particulars

requesting explanation of the $365,934 figure alleged in the original indictment's Notice of Fraud Forfeiture. *See* Rec. Doc. 365 at 15-16; *see also* Rec. Doc. 361-2 (Gov. Letter to R. Simmons); Rec. Doc. 21 (Mot. for a Bill of Particulars). The letter explained that the forfeitable sum included, *inter alia*, the amount that W. Reed received from the Hospital "in the ten years prior to the date of the Indictment," and it cautioned that "the forfeiture amount set forth in the indictment is a preliminary number and that it can, and likely will, change prior to the trial[.]" Rec. Doc. 361-2 at 2. That amount *did* change when at trial the government learned the full extent of W. Reed's fraudulent receipt of Hospital funds owed to the DA's Office. W. Reed cites no authority for the proposition that the government must lock in the particular dollar amount of its forfeiture demand in an indictment, in a discovery letter, or at any other specific time. Indeed, courts have expressly permitted post-trial changes to forfeiture demands, provided the defendant was given sufficient time to prepare a defense to the forfeiture motion. *See United States v. Diaz*, 190 F.3d 1247, 1257-58 (11th Cir. 1999) (government provided adequate notice of intent to forfeit defendant's personal residence when, after guilt phase of trial but before the forfeiture phase, it provided the defendant with a draft of the special verdict form to be presented to the jury; because the defendant knew the property sought to be forfeited, had sufficient notice of the forfeiture proceeding, and was able to defend against it, he was not deprived of his right to due process); *United States v. DeFries*, 129 F.3d 1293, 1315 (D.C. Cir. 1997) (holding that it was unnecessary to specify in a bill of particulars that the government sought forfeiture of a defendant's salary, since the indictment had placed the defendant on notice that the government would seek to forfeit everything subject to forfeiture under the applicable statute). And at least one court has reasoned at length that when the government seeks a money judgment in lieu of specific property, the defendant is not entitled to a jury determination as to the amount of the forfeiture, and the time constraints that might otherwise

necessitate pre-trial disclosure in forfeitures involving specific property are absent. *See United States v. Galestro*, No. 06-285, 2008 WL 2783360, at *11–12 (E.D.N.Y. July 15, 2008) (explaining why the "timing and manner" of the government's disclosure requirements depend on the nature of the property that the government seeks to forfeit).

W. Reed fares no better in asserting that the forfeiture should be limited either (a) to the five checks specified in the indictment, (b) to the checks paid within five years of the indictment, as per the statute of limitations for mail fraud, or (c) to the checks paid during months in which W. Reed did not personally attend Hospital Board meetings and sent an ADA in his stead. *See* Rec. Doc. 365 at 17-19. As the government argued in its motion, where a fraud case is alleged as a continuing scheme, a defendant is liable for the full amount derived from the scheme, not just proceeds derived from the acts forming the basis of the substantive counts of conviction. *See* Rec. Doc. 361-2 at 10-11 (citing *United States v. Venturella*, 585 F.3d 1013, 1015, 1015-17 (7th Cir. 2009); *United States v. Emor*, 850 F. Supp. 2d 176, 217 (D.D.C. 2012); *Yass*, 636 F. Supp. 2d at 1185. This amount includes fraudulent receipts realized outside of the statute of limitations for the substantive offense of conviction. *See* Rec. Doc. 361-2 at 11 (citing *United States v. Sagillito*, 899 F. Supp. 2d 850, 861-62 (E.D. Mo. 2012)). W. Reed does not even attempt to distinguish these authorities or offer support of his own. Nor does he explain why he is not liable to forfeit payments for those meetings that he attended. The monthly retainer was owed to the DA's Office in exchange for legal services to include the monthly attendance of a representative from that Office, but for 20 years, Reed himself kept it; whether he attended the meetings or directed an ADA to attend is of no moment where each attendee was appearing as a representative of the DA's Office.[5]

[5] W. Reed misapprehends the government's trial emphasis on those occasions in which Reed sent an ADA to a Board meeting. *See* Rec. Doc. 365 at 18-19. The point the government sought to stress was not that Reed should not have dipped into the DA's Office labor pool, but instead, that his doing so evidenced his understanding that the Hospital had contracted with the DA's Office and not with Walter Reed individually.

Reed also asserts that (d) the Eighth Amendment precludes the forfeiture of the entire 20-year sum that he unlawfully kept, and (e) the Court should employ a "quantum meruit approach" and limit the forfeiture to the payments following meetings in which an ADA attended in Reed's place. *See* Rec. Doc. 365 at 19-20. The $574,063.25 the government seeks to forfeit represents 20 years' payments to the DA's Office that Reed personally pocketed, and not a dollar more. Reed's constitutional claim is meritless.[6] So, too, is his justification for a "quantum meruit approach." Reed's suggestion that he be allowed to keep some funds because "[t]he hospital got what it paid for" misses the mark for several reasons[7]—most obviously, because the victim was not the Hospital as Reed suggests, but the DA's Office, the rightful recipient of the Hospital payments and the entity that did *not* get what it contracted for. Again, Reed fails to offer a single case to support his novel approach to forfeiture in this case.

Finally, Reed contends that the forfeiture amount should be reduced by 35% to reflect the taxes paid on that income. Although 18 U.S.C. § 981(a)(2)(B) spares a defendant from disgorgement of his "direct costs," the statute is clear that those "direct costs shall not include . . . any part of the income taxes paid by the entity." Reed gets no discount for paying taxes on income that he did not rightfully earn.

---

[6] *United States v. Bajakajian*, 524 U.S. 321 (1998), lends no support to Reed's position. There, the defendant failed to report to the U.S. Customs Service the transport across the U.S. border of more than $10,000 and, as a result, the government sought to forfeit the entire $357,144 that the defendant failed to report. The Supreme Court held that such a forfeiture was grossly disproportionate to the gravity of the offense, noting that the amount of the forfeiture bore "no articulable correlation to any injury suffered by the Government," that the offense was not related to other illegal activities, and that the forfeiture was larger than the statutory maximum penalty of the offense by "many orders of magnitude." *Id.* at 340. The case involved a defendant who, on an isolated occasion, committed a single reporting offense out of "fear stemming from cultural differences." *Id.* at 337 n.12. Reed, in contrast, defrauded the DA's Office for 20 years and now asks the Court to allow him to keep those moneys that never properly belonged to him.

[7] Ironically, in accusing the government of confusing forfeiture and restitution, it is Reed who conflates the two: The purpose of forfeiture is not to make a victim whole again, but to disgorge a defendant of his ill-gotten gains. His suggestion that the hospital got what it paid for is, again, an argument aimed at a *restitution* demand.

**CONCLUSION**

For the foregoing reasons, and pursuant to Fed. R. Crim. P. 32(b)(1)(A), the government respectfully requests that the Court grant the government's motion and enter the preliminary order of forfeiture as described therein.

Respectfully submitted,

KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY

*/s/ Jeffrey Sandman*
JEFFREY SANDMAN
Assistant United States Attorney
New York Bar Roll
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3055
Email: jeff.sandman@usdoj.gov